MORGAN, LEWIS & BOCKIUS LLP
Jonathan K. Bernstein
Craig A. Wolfe
Jason R. Alderson
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000
jonathan.bernstein@morganlewis.com
craig.wolfe@morganlewis.com
jason.alderson@morganlewis.com

*Counsel for Webster Bank, N.A.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| PREMIERE JEWELLERY, *et al.*,[1] | Case No. 20-11484 (JLG) |
| Debtors. | (Joint Administration Requested) |

**EMERGENCY MOTION OF WEBSTER BANK, N.A. FOR AN ORDER**
**DISMISSING THE DEBTORS CHAPTER 11 CASES WITH PREJUDICE**
**OR, IN THE ALTERNATIVE, DIRECTING THE APPOINTMENT**
**OF A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104**

Webster Bank, N.A. ("Webster") hereby moves the Court (the "Motion") for the entry of

an order dismissing with prejudice each of the above-captioned Chapter 11 cases of Premiere

Jewellery, Inc., and its debtor affiliates (collectively, the "Debtors") or, in the alternative,

directing the appointment of a Chapter 11 trustee in each of the Debtors' Chapter 11 cases

pursuant to section 1104 of the Bankruptcy Code (the "Motion"). In support of this Motion,

annexed hereto as Exhibit B is the Declaration of Daniel E. Burgoyne (the "Burgoyne

---

[1] The Debtors in these cases are each alleged to be incorporated or organized in the state of Rhode Island, and along with the last four digits of each Debtor's federal tax identification number are represented as follows: Premiere Jewellery, Inc. [0250]; Tanya Creations, LLC [1867]; PAW Holdings, Inc. [9043]; ETYM Properties, LLC [4377]; and PJT, LLC [3105].

Declaration" or "Burgoyne Decl."). In further support of this Motion, Webster respectfully

states as follows:

## PRELIMINARY STATEMENT[2]

1.      The Debtors' management filed these Chapter 11 Cases mere hours after a Rhode

Island Superior Court appointed a receiver and held that it had "lost all confidence"[3] in their

ability to manage the business "for the benefit of creditors going forward."[4]  The loss of

confidence stemmed from fraud, incompetence, or gross negligence, or a combination of all

three.  Peter Wallick, the Debtors' owner, president and/or sole manager, and Andrew Moser,[5]

the Debtors' Chief Restructuring Officer, either acquiesced to or participated in the submission

of at least two fraudulent borrowing base certificates in January and February 2020 to Webster

under the Debtors' Revolving Loan Agreement.

2.      This is not based on speculation or innuendo.  Rather, there is no other way to

explain the otherwise inexplicable inaction by Mr. Moser in response to an email sent on January

31, 2020 whereby the Debtors' former controller, John Redding, clearly told him that the

---

[2] Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to such terms in the balance of the Motion.

[3] Pages 18:24-19:1 of the transcript of the State Court hearing conducted on June 25, 2020, in connection with the Second Receiver Petition (the "Hearing Transcript" or "Hr'g. Tr."). Attached as **Exhibit 1** to the Burgoyne Decl. is a true and correct copy of the Hearing Transcript.

[4] *Id*.

[5] This is not the first time Mr. Moser has encountered allegations of fraud and other improper conduct. In *Salus Capital Partners, LLC v. Andrew Moser,* 289 F.Supp.3d 468 (S.D.N.Y. 2018), Mr. Moser, represented by Jeffrey Wurst (counsel to the Debtors here), challenged the confirmation of an arbitration award in favor of Salus Capital Partners, LLC. The District Court overruled Mr. Moser's challenge and confirmed the award in toto. As set forth in the opinion, Salus had removed Mr. Moser in 2015 as Chief Executive Officer for, among other things, the alleged misappropriation of company funds in amounts that included (i) $100,000 for audio-visual equipment that Mr. Moser attempted to conceal with falsified invoices; and (ii) $90,000 for patio furniture, watches, family travel, Amazon.com purchasers, and other items. *Id.* at 472-473. Salus initiated the arbitration proceeding after Mr. Moser allegedly failed to reimburse the indebtedness, and in a twenty-seven page opinion the arbitrator awarded Salus (i) approximately $225,000 on account of personal charges; (ii) $879,514.02 in the form of disgorgement under New York's faithless servant doctrine after finding Mr. Moser attempted to conceal certain of the personal charges; and (iii) approximately $1.5 million for the reimbursement of attorneys' fees and pre-award interest. *Id.* at 473-474. In confirming the award, the District Court noted that while the award was large compared to the amount of "misused" funds, "each dollar is directly attributable to Moser's own misconduct, Moser's misstatement to auditors, and his failure to cooperate in the ensuing investigation . . ." *Id.* at 482.

borrowing base certificate for the December 2019 period was fraudulent by overstating the value of accounts receivable. Mr. Redding _told_ Mr. Moser that the certificate "has no basis in reality" and inquired if it "would fool" Mr. Moser, and if so, to forward it on to Mr. Wallick for certification prior to submitting to Webster. Mr. Redding also _asked_ Mr. Moser to let him know if he wanted the fraudulent certificate changed. The answer came several hours later on January 31, 2020, when the fraudulent borrowing base certificate, now certified by Mr. Wallick, was submitted to Webster.

3.     Any doubt as to the culpability of Messrs. Wallick and Moser was then shredded when the process repeated itself the following month when an equally fraudulent borrowing base certificate for the January 2020 operating period was submitted to Webster on February 20, 2020. By this point, Mr. Moser surely knew that a fraudulent borrowing base certificate had previously been submitted to Webster on January 31. On February 20, it happened again. Twice on Mr. Moser's watch, the borrowers submitted fraudulent borrowing base certificates to Webster, and twice he took no effective action to stop it. Mr. Wallick, in again certifying a fraudulent report, may have been particularly incentivized to do so in order to induce Webster to keep lending and his business above water, and avoid corresponding liability as a personal guarantor under the Webster facilities.

4.     The magnitude of the fraud finally came to light when, on March 28, 2020, the Debtors submitted a borrowing base certificate for the March operating period that restated the value of accounts receivable collateral to approximately $2.1 million—a sharp decrease from the $6.9 to $6.4 million in value stated on the three prior borrowing base certificates. By this time the fraud had worked its intended purpose as Webster had already advanced an aggregate $1.9

3

million (approximate) under Revolving Loan Agreement based on fraudulent borrowing base reports that certified the existence of illusory collateral.

5.        Attempts by Debtors' management to evade the findings of the State Court as to their lack of fitness to oversee and operate the Debtors' business and the State Court's efforts to protect creditors resulted in the filing of these Chapter 11 Cases, and presents a classic bad faith filing.  Webster, as the Debtors' lender under the Secured Credit Agreements with over $9.2 million outstanding, is by any objective measure the largest economic stakeholder in these cases by an overwhelming margin.  The Debtors have been insolvent for months, the Secured Credit Agreements are in default and have matured or been accelerated, and all or substantially all assets of the Debtors' estates are encumbered by these credit facilities.  With recoveries to other creditor constituencies remote to the point of speculation, this is and has been a quintessential two party dispute.  That dispute was well on its way to being resolved in a Receivership Action that commenced two and a half months ago.  Yet, Debtors' management frustrated the efforts of the State Court to protect creditors by immediately filing these free-fall Chapter 11 Cases with no ability to reorganize after the State Court specifically deemed *them* unfit to maximize value for creditors.  Allowing these bad faith filings to linger in lieu of the Receivership Action will benefit one party and one party only—management—to the manifest detriment of Webster and all other creditors.    Accordingly, the prompt dismissal of these Chapter 11 Cases is the appropriate response to the bad faith filings.

6.        Alternatively, "cause" plainly exists for the appointment of a Chapter 11 trustee. The ongoing perpetration of the above-described fraud with respect to the borrowing base certificates, in combination with incompetence and/or gross negligence renders Debtors' management unfit to act as estate fiduciaries.  This is not the mere opinion of the Debtors' largest

economic stakeholder, Webster.  It bears repeating that the State Court ordered the immediate *removal* of management from the Debtors' business after notice and hearing, stating it had "lost all confidence" in management's ability to run the business for the benefit of creditors.  The State Court was so concerned by developments that it inserted a receiver without waiting for an investigative report to be submitted by the previously appointed Examiner in five days.[6]  The State Court also telegraphed its alarm to any future Federal Court, i.e., to this Court, stating "I want to be very clear if there is a filing made in Federal Court, that this Court has made a determination that a *court fiduciary should be in place to oversee the business at this point*."[7]

7.      In these circumstances, this same management cannot and should not be trusted, much less permitted to flaunt the State Court's findings and remain in their positions as estate fiduciaries.  If these Chapter 11 Cases are allowed to continue, all creditors will benefit from a truly independent fiduciary that the State Court has already held necessary to protect the interests of creditors.

8.      For these reasons and those set forth below, Webster urges the Court to immediately dismiss the Chapter 11 Cases and permit the Receivership Action to continue or, in the alternative, direct the immediate appointment of a Chapter 11 trustee.

## JURISDICTION AND VENUE; RESERVATION OF RIGHTS

9.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

10.     The Debtors contend that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Webster is investigating whether this Court represents proper venue given that the Debtors are all incorporated or organized in Rhode Island, their principal places of

---

[6] Hr'g. Tr. at 17-18.
[7] Hr'g. Tr. at 21:3-8 (emphasis in italics added).

business are in Rhode Island, Peter Wallick resides and works on Rhode Island and, with conspicuous exception of Mr. Wurst, counsel appearing on behalf of the parties in the Receivership Action are barred and practice in Rhode Island.  Webster would submit that the sole basis on which these cases were filed in the present venue is the convenience of Mr. Wurst and not based on the appropriateness of the present venue.  Webster reserves all rights to contest venue if necessary and the filing of this Motion on an emergency basis in response to the Chapter 11 Cases shall not be deemed to constitute a waiver of any of Webster's rights to do so.

## RELEVANT BACKGROUND

11.     On June 25, 2020 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  No trustee or examiner has been appointed in these cases.

12.     The Chapter 11 Cases were filed the same day the Providence/Bristol County (Rhode Island) Superior Court ("State Court") [Case No. 2020-03151 before the Honorable Associate Justice Brian P. Stern (the "Receivership Action")], appointed a temporary receiver to take possession and charge of the Debtors' property and business pending further order of the State Court.  The State Court scheduled a hearing on July 24, 2020 for the receiver's permanent appointment.  Events leading up to the Receivership Action and the State Court's appointment of a receiver are set forth below.

### A.     The Debtors' Capital Structure

13.     Peter A. Wallick directly owns 100% of the equity of Debtor Premiere Jewellery, Inc. ("Premiere") and Debtor PAW Holdings, Inc. ("PAW").  PAW directly or indirectly holds 100% of the respective membership interests of Debtor Tanya Creations, LLC ("Tanya") and Debtor PJT, LLC ("PJT").  Mr. Wallick holds 70% of the membership interests of Debtor EYTM

6

Properties, LLC ("EYTM"), with the balance held by various family members.  Mr. Wallick is the president or sole-manager (as applicable) for each of the Debtors.

14.    As of the Petition Date, the aggregate outstanding balance due and owing by the Debtors under the Secured Credit Agreements (defined below) is $9,221,453.33, as follows:

1. Revolving Loan Agreement.  Originally dated April 19, 2007, the revolving loan facility provided by Webster has undergone numerous amendments (the "Revolving Loan Agreement").  At present, the borrowers under the Revolving Loan Agreement are PAW and Tanya, the guarantors are Premiere, PJT, EYTM and Mr. Wallick, and the amount of the line of credit made available under the agreement is an aggregate maximum amount of $11 million.  The Revolving Loan Agreement is secured by (i) valid, perfected and enforceable security interests and all-asset liens in and on all personal property of the Debtors primarily consisting of account receivables, inventory, equipment, and certain life insurance policies held by Mr. Wallick; and (ii) a second mortgage on the EYTM Real Estate (defined below).  The Revolving Loan Agreement matured on March 31, 2020 and is currently in default.  As of the Petition Date, the aggregate outstanding balance due and owing under Revolving Loan Agreement is $7,672,641.11.

2. Real Estate Loan.  On September 26, 2017, EYTM, as borrower, the remaining Debtors and Mr. Wallick, as guarantors, and Webster, as lender, entered into a real estate loan (the "Real Estate Loan") pursuant to which EYTM borrowed $1.735 million against real property it owns in Rhode Island (the "EYTM Real Estate").  The Real Estate Loan is secured by a first mortgage on the EYTM Real Estate, and is currently in default as a result of the defaulted Revolving Loan Agreement.  As of the Petition Date, the aggregate outstanding balance due and owing under the Real Estate Loan is $1,510,895.73.

3. Term Loan. On December 11, 2015, PAW, as borrower, the remaining Debtors and Mr. Wallick, as guarantors, and Webster, as lender, entered into a loan agreement (as amended and in effect from time to time, the "Term Loan," and together with the Revolving Loan Agreement and the Real Estate Loan, and the "Secured Credit Agreements"), pursuant to which PAW borrowed $325,000.  The Term Loan is currently in default as a result of the defaulted Revolving Loan Agreement.  As of the Petition Date, the aggregate outstanding balance due and owing under the Term Loan is $37,916.49.

15.     As is common with revolving loans, borrowing availability under the Revolving Loan Facility is determined by a formula that takes into account, among other things, the value of the accounts receivable and inventory collateral held by the Debtors at any given time. Borrowing availability is then reconciled on at least a monthly basis based on information provided by the Debtors in the form of a borrowing base certificate ("BBC") that is certified by Debtors' management.

16.     The amount of unsecured indebtedness held by the Debtors is not known with clarity as their schedules of assets and liabilities have not been filed. The consolidated list of the Debtors' twenty largest unsecured creditors filed with their petitions discloses approximately $2.7 million in claims.

17.     Upon information and belief, the Debtors received an unsecured Paycheck Protection Program (PPP) loan under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the "PPP Loan"). The PPP Loan is not identified on the consolidated list of the Debtors' largest twenty creditors. The remaining balance of the PPP Loan is unknown, but upon information and belief the PPP Loan has been rapidly diminished given the little or no other revenue being generated by the Debtors, and at this point nearly exhausted after being utilized to fund expenses that included the preparation of these Chapter 11 Cases

**B.     The Receivership Action**

18.     On April 10, 2020, Webster filed a petition in the State Court to appoint a temporary receiver to immediately take charge of the Debtors' property, assets and business (the "Initial Receiver Petition").[8] The filing was primarily prompted after Tanya's BBC as of March 28, 2020 under the Revolving Loan Agreement revealed a precipitous $4 million drop in collateral value compared to certified values on BBCs submitted for the prior three months.

---

[8] Attached as **Exhibit 2** to the Burgoyne Decl. is a true and correct copy of the Initial Receiver Petition.

With the collapse in collateral value the Revolving Loan Agreement was suddenly and substantially overadvanced. Boston and Associates, a certified public accountant and fraud examiner retained by Webster to evaluate a then-pending request by the Debtors to extend the March 31, 2020 maturity of the Revolving Loan Agreement, concluded that certain of the BBCs submitted by Tanya materially and intentionally overstated the value of accounts receivable.

19. On April 22, 2020, the State Court declined to immediately appoint a temporary receiver and instead ordered the appointment of Joseph M. DiOrio, Esq.[9] as examiner ("Examiner") of the Debtors to assess and report on, among other things, their finances and operations, as well as their continuing viability as a going concern ("Examiner Order").[10] The State Court specifically instructed the Examiner to report on the facts and circumstances surrounding the substantial decrease in collateral value disclosed on Tanya's BBC as of March 31, 2020. Further, under the Examiner Order, the Debtors were required to cooperate with the Examiner in the conduct of his investigation, including providing access to all books and records, and such other information as the Examiner deemed appropriate.

20. Several days later on April 28, 2020, the State Court approved the Examiner's request to engage an accountant to assist in his investigation under the Examiner Order.

21. On June 17, 2020, Webster filed in the State Court a motion to convert the Examiner into a permanent receiver of the Debtors (the "Second Receiver Petition").[11] Alarmingly, the Examiner's investigation disclosed an internal email between the Debtors' apparently now-former controller, John Redding, and the Debtors' then and now Chief Restructuring Officer, Andrew Moser, dated January 31, 2020, at 9:23 a.m. (the "Jan. 31

---

[9] Mr. DiOrio is bankruptcy and creditors' rights attorney with the Diorio Law Office located in Providence, Rhode Island.

[10] Attached as **Exhibit 3** to the Burgoyne Decl. is a true and correct copy of the Examiner Order.

[11] Attached as **Exhibit 4** to the Burgoyne Decl. is a true and correct copy of the Second Receiver Petition.

Email").[12]   In the Jan. 31 Email, Mr. Redding refers to Tanya's BBC as of December 31, 2019 (attached to the email), and states the following to Mr. Moser:

> This is it.  We'll lose a bit and it has no basis in reality.
>
> See if it would fool you – if so, have Peter [Wallick] sign, then have Mike scan it forwarding it to my email.
>
> If you want it changed let me know.
>
> I have to send an inventory and AR Aging along with the signed BBC.

(Jan. 31. Email.).   Mr. Redding's statement "[w]e'll lose a bit" is in reference to the BBC submitted as of November 30, 2019, and a reduction of approximately $186,000 in borrowing availability under the Revolving Loan Agreement with the submission of the BBC as of December 31, 2019.

22.     There is no contemporaneous record of Mr. Moser raising any objection to the Jan. 31 Email, and approximately two and a half hours after it was sent Mr. Redding forwarded to Webster a BBC as of December 31, 2019, signed and certified by Mr. Wallick (the "Dec. BBC Email").[13]   The BBC received by Webster as of December 31, 2019 is substantially the same as the draft BBC attached to the Jan. 31 Email.

23.     The Debtors' scheme to intentionally "fool" Webster continued with the submission of BBCs containing the fraudulently inflated collateral values for January and February 2020.  It was only in late March 2020, as stated above, that the Debtors submitted a BBC detailing the scope of the fraud with the loss of over $4 million in collateral value, which in turn prompted the Initial Receiver Petition, as illustrated by the following chart:

---

[12] Attached as **Exhibit 5** to the Burgoyne Decl. is a true and correct copy of the Jan. 31 Email.

[13] Attached as **Exhibit 6** to the Burgoyne Decl. is a true and correct copy of the Dec. BBC Email.

| BBC Date[14] | Net Eligible Account Receivables | Advance Limit Per Formula | Loan Balance Per BBC | Net Borrowing Availability |
|---|---|---|---|---|
| 12/9/2019 (BBC as of 11/30/2019) | $6,926,526.73 | $8,725,527.21 | $8,612,551.79 | $113,020.92 |
| 1/31/2020 (BBC as of 12/31/19) | $6,742,063.79 | $8,539,271.04 | $7,927,962.19 | $611,308.85 |
| 2/20/20 (BBC as of 1/31/20) | $6,418,145.67 | $8,316,430.27 | $7,927,962.19 | $388,468.08 |
| 3/31/2020 (BBC as of 3/28/20) | **$2,127,523.19[15]** | $3,826,474.57 | $7,926,074.92 | **($4,099,600.35)** |

24.     As a result of the fraudulent BBCs submitted by Tanya to Webster on January 31 and again on February 20, 2020, Webster made approximately 23 more advances under the Revolving Loan Agreement representing funds in the gross amount of $1,992,459.92. Unbeknownst to Webster, these advances were made against non-existent borrowing base collateral.  Counsel for the Debtors in the State Court conceded "there was a financial problem here"[16] and even called into the question the veracity of BBCs submitted in prior years.[17]

25.     On June 22, 2020, the Debtors filed a response objecting to the Second Receiver Petition. (the "Debtors' Objection").[18]

**C.     The Hearing on June 25, 2020 in State Court**

26.     On June 25, 2020, Justice Stern conducted a hearing on the Second Receiver Petition and in granting the request explained, based on the new revelations discovered by the Examiner, that (as noted above) the State Court had "lost all confidence" in the ability of Debtors' management to operate the business for the benefit of creditors.  The State Court was

---

[14] Attached as **Exhibit 7** to the Burgoyne Decl. are true and correct copies of the four BBCs, respectively, that immediately preceded the filing of the Initial Receiver Petition.

[15] The Examiner, Mr. DiOrio, explained that the $4 million loss in collateral value may actually be understated. "The books and records of this place are not good at all.  So I can't tell you with any precision what the [over] advance is, but I believe it has increased and perhaps substantially since the $4 million one by reason of ageing out of receivables, backing the ineligibles that were reported erroneously as eligible."  Hr'g Tr. at 14:24-15:5

[16] Hr'g. Tr. 10:3.

[17] Hr'g. Tr. 10:3-6.

[18] Attached as **Exhibit 8** to the Burgoyne Decl. is a true and correct copy of the Debtors' Objection to the Second Receiver Motion.

also incredulous with Mr. Moser's affidavit annexed to the Debtors' Objection and his attempt to

explain away Mr. Redding's email, namely that he had only recently been retained and he was

not responsible for the Debtors' borrowing base certificates.  The State Court flatly rejected the

notion that Mr. Moser, as the Chief Restructuring Officer, was not responsible:

> But what is very clear, based on this e-mail and affidavit, is that we
> have **Mr. Moser** who is new who came in, okay, and **basically
> said when he got the e-mail, and I don't care that he was only
> there 11 or 12 days, I see nothing.  It's not my problem**.  You
> guys deal with it.  As far as the Court is concerned, that is
> extremely troubling.  **I would expect a person who is in the
> business who gets an e-mail like this to say stop.  We are not
> sending anything out.   We are going to conduct an
> investigation.  What's going on?**  Don't go to anyone else to have
> this [the BBC] signed, because that is his [Mr. Moser's] role [to
> take the BBC to Mr. Wallick for certification].

Hr'g. Tr. 17:23-18:9.

27.    The State Court added that Mr. Moser's conduct made it "extremely

concerned,"[19] so concerned that the State Court wanted the record to clearly demonstrate to any

future Federal Court "that a court fiduciary should be in place to oversee the business at this

point."[20]

28.    The (i) State Court entered an order, dated June 25, 2020, granting the Second

Receiver Petition and appointing the Examiner as the temporary receiver (subject to becoming

permanent pursuant to a hearing that was scheduled for July 24, 2020) (the "Receiver Order");

and (ii) State Court Clerk provided notice of the Receiver Order.[21]

29.    As noted above, the Debtors responded the same day by filing the Chapter 11

Cases.

---

[19] Hr'g. Tr. 18:14.

[20] Hr'g. Tr. 21:4-8.

[21] Attached as **Exhibits 9** to the Burgoyne Decl. are true and correct copies of the Receivership Order and notice, respectively.

## RELIEF REQUESTED

30.    By this Motion, Webster requests that the Court enter an Order dismissing with prejudice the Chapter 11 Cases under section 1112(b) of the Bankruptcy Code or, in the alternative, directing the appointment of a Chapter 11 trustee, namely Mr. DiOrio given his prior extensive knowledge of the Debtors as Examiner, pursuant to section 1112(b) of the Bankruptcy Code.

## ARGUMENT

### A.    The Chapter 11 Cases Were Filed in Bad Faith and Should be Dismissed

31.    Section 1112(b) of the Bankruptcy Code provides for the dismissal of a chapter 11 case upon the movant's establishment of cause.  Subsection (b)(1) provides that:

> [e]xcept as provided in paragraph (2) and subsection (c) of this section, on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).

32.    It is well-settled that one form of cause for dismissal under section 1112(b) is that the case was filed in bad faith or that the case demonstrates attributes of bad faith.  *See In re CTC 9th Ave. P'ship*, 113 F.3d 1304, 1310 (2d Cir. 1997); *see also In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222, 227-28 (2d Cir. 1991); *In re SGL Carbon Corp.*, 200 F.3d 154, 160-61 (3d Cir. 1999) (compiling cases); *In re Schur Management Co.*, 323 B.R. 123, 126 (Bankr. S.D.N.Y. 2005).  The bad faith determination is made as of the Petition Date.  *See In re 68 W. 127 St., LLC,* 285 B.R. 838, 844 (Bankr. S.D.N.Y. 2002) (citing *In re Cohoes Indus. Terminal, Inc.*, 931 F.2d at 227-28 (2d Cir. 1991).

33.     In *CTC 9th Ave.*, the Second Circuit articulated eight non-exclusive factors indicative of a bad faith filing and justifying dismissal:

1.  the debtor has only one asset;

2.  the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;

3.  the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

4.  the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;

5.  the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

6.  the debtor has little or no cash flow;

7.  the debtor can't meet current expenses including the payment of personal property and real estate taxes; and

8.  the debtor has no employees.

*In re CTC 9th Ave. P'ship*, 113 F.3d at 1311.

34.     Each of these factors is not required for the Court to make a finding of bad faith. Rather, the Court must conduct a careful analysis and determine the motion based on a totality of the circumstances. *See In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309, 334-35 (Bankr. S.D.N.Y. 2001).

35.     Here, multiple bad faith factors are present justifying dismissal as set forth below in order of appearance under *CTC 9th Ave.*

### ***The Second Factor – Unsecured Creditors***

36.     Although the Debtors reportedly have at least twenty creditors pursuant to their top creditor list, their claims are dwarfed by the over $9.2 million in outstanding obligations

owed to Webster under the Secured Credit Agreements. The Debtors have been insolvent for months, and their business is generating little or no revenue. The Secured Credit Agreements are in default and/or matured and accelerated, and Webster's secured claims are undoubtedly undersecured by a substantial margin, especially in light of the fraudulent BBCs. Without a significant infusion of capital from the Debtors' equity owner (Wallick) or a third party, the likelihood of a meaningful recovery for unsecured creditors is remote in the extreme. Mr. Wallick as a funding source is dubious at best, as he is currently subject to a separate enforcement action by Webster in State Court on account of his personal guarantees under the Secured Credit Agreements. Further, Webster understands that Mr. Wallick, upon information and belief, has no intention of providing the Debtors with additional capital. Webster is and will remain the Debtors' overwhelmingly dominate economic stakeholder, and thus the second factor weighs in favor of Webster.

### The Fourth Factor – Two Party Dispute That Should be Resolved in the Receivership Action

37.     The fourth factor heavily weighs in favor of Webster and the Receivership Action. The in-essence two party nature of these Chapter 11 Cases is amply illustrated by the discussion directly above. The abrupt halt to the Receivership Action by the instant filings deprived Webster and other creditors of a State Court that has already been deeply involved in the Debtors' affairs since early April, and a knowledgeable and experienced receiver ready and able to maximize the value of all of the Debtors' assets in an efficient forum. This last point—efficiency—cannot be overstated. The administrative burn the Debtors have incurred and will continue to incur in these Chapter 11 Cases will rapidly consume what little liquidity remains, and likely serves to the deprive Webster and other creditors from recoveries that otherwise will be available in the Receivership Action if it is allowed to proceed.

38.    The State Court found management unfit to remain in charge of the Debtors'

business and ordered their replacement by the receiver.    Yet that is where management will

remain if the Receivership Action is tossed aside and these Chapter 11 Cases are allowed to

continue.    Accordingly, the fourth factor standing alone warrants the immediate dismissal of

these Chapter 11 Cases.

### The Fifth Factor – The Chapter 11 Cases Evidence an Intent to Delay and Frustrate the Rights of a Secured Creditor

39.    The fifth factor unquestionably weighs in favor of Webster and a continuation of

the Receivership Action.    As noted above, the Receivership Action commenced over two and a

half months ago on April 10, 2020 after the Debtors filed the March BBC and restated the value

of their accounts receivable collateral.    The Examiner then discovered the fraudulent scheme

intended to "fool" Webster into making advances under the Revolving Loan Agreement against

phantom collateral.    On the *same day* the State Court found management unfit to remain to in

control and appointed a receiver, the Debtors commenced these free-fall Chapter 11 Cases with

the same management in charge and no apparent means of successfully funding operations or

reorganizing.    Objectively, if this does not represent an attempt to "delay or frustrate the

legitimate efforts of the debtor's secured creditors to enforce their rights," then Webster is at a

loss to explain what would demonstrate such an attempt.

### The Sixth and Seventh Factors – Little or No Cash Flow; Unable to Satisfy Expenses

40.    The similar sixth and seventh factors also weigh in favor of dismissal given the

current posture of the Chapter 11 Cases.    As noted above, there is no evidence that the Debtors

have sufficient liquidity to fund the administrative burden of these Chapter 11 Cases and

adequately protect Webster on account the diminution of the value of its collateral.    While it is a

16

certainty the Debtors need financing to fund these cases, it is less clear how they will successfully clear this hurdle given that Webster's liens encumber all or substantially all assets, coupled with the need to provide Webster with significant adequate protection on account of the Secured Credit Agreements.  These factors will continue to weigh in favor of Webster unless and until the Debtors demonstrate otherwise.

41.     Once, as here, the good faith of a debtor is called into question with respect to the filing of these cases, the burden shifts to the debtor to demonstrate that the petition was filed in good faith.  *In re Syndicom Corporation*, 268 B.R. 26, 49 (Bankr. S.D.N.Y. 2001); *Stage I Land Co. v. U.S. Housing and Urban Development Dep't*, 71 B.R. 225, 229 (D. Minn. 1986).  Chapter 11 is intended to allow an honest debtor to reorganize, and that is a far cry from what the Debtors are attempting to do here.  As soon as the State Court found it no longer had any faith in Debtors' management to run the company for the benefit of creditors, within a span of a few hours management moved to thwart the State Court's decision and remain in charge by filing these free-fall Chapter 11 Cases.  It is difficult to imagine a more blatant attempt to delay and foil the Receivership Action and frustrate the legitimate efforts of Webster (the Debtors' largest stakeholder) to enforce and protect its rights.  Webster and all other creditors will be irreparably harmed as what little value remains in the enterprise is frittered away.  This is categorical bad faith, and the Chapter 11 Cases must be dismissed.

**B.     Alternatively, the Court Must Appoint a Trustee Upon a Finding of Cause or Where It Is in the Interests of Creditors and Other Interests of the Estates**

42.     Section 1104(a) of the Bankruptcy Code provides that the Court *shall* order the appointment of a trustee, at any time after the commencement of the case but prior to the

confirmation of a plan, on a request of a party in interest or the U.S. Trustee,[22] and after notice

and a hearing:

> (1) for cause, including **fraud, dishonesty, incompetence, or gross mismanagement** of the affairs of the debtor **by current management**, **either before or after the commencement of the case,** or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. §1104(a)(1)-(2) (emphasis in bold added).

43.     Subsection (a)(1) addresses management's pre- and post-petition misdeeds or

mismanagement, while subsection (a)(2) provides the court with "particularly wide discretion" to

appoint a trustee even absent wrongdoing or mismanagement.  *In re Bellevue Place Assocs.*, 171

B.R. 615, 623 (Bankr. N.D. Ill. 1994).   Where the court finds either that cause exists or that

appointment is in the interest of the parties, an order for the appointment of a trustee is

mandatory.  *In re W.R. Grace & Co.*, 285 B.R. 148, 158 (Bankr. D. Del. 2002).

44.     A debtor in possession and its officers and managing employees have a fiduciary

duty to creditors and shareholders, and an "obligation to treat all parties, not merely the

shareholders, fairly."  *In re The AdBrite Corporation*, 290 B.R. 209, 217 (Bankr. S.D.N.Y. 2003)

---

[22] Section 1104(e) directs the U.S. Trustee to move for the appointment of a trustee under certain circumstances, providing as follows:

> The United States trustee *shall* move for the appointment of a trustee under subsection (a) if there are reasonable grounds to suspect that current members of the governing body of the debtor, the debtor's chief executive or chief financial officer, or members of the governing body who selected the debtor's chief executive or chief financial officer, participated in actual fraud, dishonesty, or criminal conduct in the management of the debtor or the debtor's public financial reporting.

11 U.S.C. § 1104(e).

(citing *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355-56, 105 S.Ct. 1986,

85 L.Ed. 2d 372 (1985)); *In re Hampton Hotel Investors, L.P.*, 270 B.R. 346, 357-358 (Bankr.

S.D.N.Y. 2001); *see also In re Northwest Airlines Corporation*, 483 F.3d 160, 181 (2d Cir. 2007)

(observing that a debtor in possession has a fiduciary duty to creditors and the estate).   The

presumption that a debtor should remain in possession of its estate and in control of its affairs

holds only if management "can be depended upon to carry out the fiduciary responsibilities of a

trustee."   *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. at 355; *see also*, *In re

Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990) ("a debtor-in-possession must

act as a 'fiduciary of his creditors' to 'protect and to conserve property in his possession for the

benefit of creditors,' and to refrain [ ] from acting in a manner which could damage the estate . .

." (citing *In re Sharon Steel Corp.* 86 B.R. 455, 457 (Bankr. W.D. Pa. 1988), *aff'd*, 871 F.2d

1217 (3d Cir. 1989)).

45.     Among the fiduciary duties of a debtor in possession is the primary goal of the

bankruptcy process: "to get the creditors paid."   *In re Ionosphere Clubs*, 113 B.R. at 169

(quoting *In re Pied Piper Casuals, Inc.*, 40 B.R. 723, 727 (Bankr. S.D.N.Y. 1984)).   Moreover,

a debtor in possession's fiduciary duties also "include a duty of care to protect the assets, a duty

of loyalty and a duty of impartiality."   *In re Bowman*, 181 B.R. 836, 843 (Bankr. D. Md. 1995).

To fulfill its duty of loyalty, a debtor in possession must "avoid self-dealing, conflicts of

interest and the appearance of impropriety."   *Id.*

46.     When a debtor in possession is incapable of performing its fiduciary duties, or

when creditors' confidence in management evaporates, a chapter 11 trustee must be appointed.

*See In re McCorhill Publ'g, Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987); *In re Marvel

Entm't Grp.*, 140 F.3d 463, 473 (3d Cir. 1998).   "[I]n the appropriate case, the appointment of a

trustee is a power which is critical for the Court to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interests of creditors are served." *In re Suncruz Casinos, LLC*, 298 B.R 821, 828 (Bankr. S.D. Fla. 2003); *see also*, *In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989) ("Section 1104(a) represents a potentially important protection that courts should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession").

47.     As explained more fully below, the appointment of a chapter 11 trustee is warranted under the circumstances, pursuant to sections 1104(a)(1) and 1104(a)(2) of the Bankruptcy Code.

### (i) There is Abundant "Cause" Under Section 1104(a)(1) to Warrant the Appointment of a Chapter 11 Trustee

48.     While section 1104(a)(l) of the Bankruptcy Code expressly identifies four bases upon which "cause" may be found—fraud, dishonesty, incompetence, and gross mismanagement—those enumerated grounds are not exclusive.

49.     Additional grounds may be determined on a case-by-case basis. *See In re V. Savino Oil*, 99 B.R. at 525; *In re Sharon Steel Corp.*, 871 F.2d at 1226.  Cause also may be established by the (1) materiality of the misconduct of the debtor's management, (2) evenhandedness or lack of same in dealings with insiders or affiliated entities vis-a-vis other creditors, (3) existence of pre-petition voidable preferences or fraudulent transfers, (4) unwillingness or inability of management to pursue estate causes of action, (5) conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor, and (6) self-dealing by management or waste or squandering of corporate assets. *See In re Marvel Entm't Grp., Inc.*, 140 F.3d at 472-73; *In re Sharon Steel Corp.*, 871 F.2d at 1228; *In re Intercat, Inc.*, 247 B.R. at 911, 920-21 (Bankr. S.D. Ga. 2000).  Once a party has proven

20

"cause" under section 1104(a)(1), a bankruptcy court must grant the requested relief.  *See In re V. Savino Oil,* 99 B.R. at 525; *In re Deena Packaging Indus., Inc.*, 29 B.R. 705, 706 (Bankr. S.D.N.Y. 1983).

50.     Prepetition conduct of the type alleged to have occurred prior to the commencement of these Chapter 11 Cases is sufficient to warrant the appointment of a trustee. *See* 11 U.S.C. § 1104(a)(1) (the relevant "cause" for appointment of a trustee may exist "either before or after the commencement of the case"); *see also*, *In re V. Savino Oil*, 99 B.R. at 526 ("[t]his pre-petition course of conduct, in and of itself, constitutes 'cause' for the appointment of a Chapter 11 trustee.").

51.     Here, management's conduct with the respect to the BBCs easily satisfies each of the four primary grounds mandating the appointment of a Chapter 11 Trustee.  At least two of the BBCs at issue were fraudulent, i.e., the BCCs submitted in January and February 2020.  And Mr. Moser knew or should have known the BBCs were fraudulent not through some independent auditing exercise or other machinations.  No, he knew the BBCs had "no basis in reality" and were intended to "fool" Webster because Mr. Redding *told* Mr. Moser of their precise purpose in the shockingly clear and concise Jan. 31 Email.  Mr. Redding then *asked* Mr. Moser if he wanted the BBCs changed, and Mr. Moser's response was to permit their submission to Webster. Debtors' top management also knew, because of course they did, that the BBCs governed availability under the Revolving Loan Agreement, and in the unlikely event they had forgotten Mr. Redding helpfully reminded Mr. Moser of this aspect by stating the January BBC would cause them to "lose a bit."

52.     Messrs. Moser and Wallick each then failed to act.  Mr. Wallick, the owner, and the president and/or sole manager of each of the Debtors, certified the BBCs and was particularly

21

incentivized to do so to stave off liability as a personal guarantor under the Secured Credit Agreements by keeping the business afloat as long as possible.  Mr. Moser, the Debtors' then and current Chief Restructuring Officer, not only failed to address the fraud specifically referenced in the Jan. 31 Email on account of the January BBC, he also allowed the equally fraudulent February BBC to go out the door without challenge.  With years of experience working for asset-based lenders, including a stint as the chief executive officer at a leading asset-based commercial financing company, Mr. Moser knew the very negative implications of the submission of the fraudulent borrowing base certificates on Webster's ability to recover is loans.  Mr. Moser was supposed to act, knew that his fiduciary duties as an officer in an insolvent company mandated that he act, but in each case he failed to do so.

53.    Again, the State Court held at the hearing on the Second Receiver Petition that it had lost all confidence in the ability of Debtors' management to run the businesses for the benefit of creditors.  The State Court was so alarmed that it alerted any future Federal Court of its determination that a "court fiduciary should be in place to oversee the business."  It is impossible to hold otherwise.  Mr. Wallick is a businessman with years of experience, and to certify borrowing base certificates with grossly inflated accounts receivable without knowledge of their fraudulent intent strains credulity.  In addition to his years as a lending professional, Mr. Moser, for all intents and purposes, *ran a bank*.  Or as the State Court put it, Mr. Moser was "in the business."[23]  For this to happen not once but twice under their collective watch constitutes fraud, dishonesty, incompetence, or gross mismanagement, or it represents a combination of all four.  The degrees of culpability by and between Messrs. Moser and Wallick need not be parsed to warrant the appointment of a Chapter 11 trustee as each charge is damning, and neither individual is in a position to continue running the Debtors' business as they cannot be trusted to

---

[23] Hr'g. Tr. 18:5.

serve as estate fiduciaries.    The State Court easily recognized this in granting the Second

Receiver Petition, and neither Messrs. Moser and Wallick should be allowed to utilize these

cases   as a means to nullify and disregard the State Court's finding and continue to foist

themselves on processes that are designed to protect Webster and the Debtors' other creditors in

these Chapter 11 Cases.

### *(ii) Additionally, the Court Must Appoint a Trustee Under 11 U.S.C. § 1104(a)(2) Because it is in the Interests of Creditors*

54.    Section 1104(a)(2) of the Bankruptcy Code allows the appointment of a trustee

even when no "cause" exists.  *See In re Sharon Steel Corp.*, 871 F.2d at 1226; *In re Ionosphere*

*Clubs*, 113 B.R. at 168.   Under section 1104(a)(2), the Court may appoint a trustee, in its

discretion, to address "the interests of the creditors, any equity security holders, and other interests

of the estate."  11 U.S.C. § 1104(a)(2); *In re Sharon Steel Corp.*, 871 F.2d at 1226.

55.    Under section 1104(a)(2), courts "look to the practical realities and necessities."

*In re Euro-American Lodging Corp.*, 365 B.R. 421, 427 (Bankr. S.D.N.Y. 2007).   Among the

factors courts consider are "(i) the trustworthiness of the debtor; (ii) the debtor in possession's

past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence—

or lack thereof—of the business community and of creditors in present management; and (iv) the

benefits derived by the appointment of a trustee, balanced against the cost of the appointment."

*Id*. (citations omitted).

56.    In determining the best interests of creditors and the estate, courts "resort to

[their] broad equity powers ... equitable remedies are a special blend of what is necessary, what

is fair and what is workable."  *In re Hotel Assocs., Inc.*, 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980);

*see In re Wings Digital Com.*, 2005 Bankr. LEXIS 3476, at *14 (Bankr. S.D.N.Y. May 16, 2005)

(section 1104(a)(2) is a "lesser standard" than section 1104(a)(1)).   In exercising these broad

equitable powers to appoint a trustee under section 1104(a)(2), courts "eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests." *In re Hotel Assocs., Inc.*, 3 B.R. at 345. Accordingly, the standard for appointment of a chapter 11 trustee under section 1104(a)(2) is flexible, and each of the four considerations described above that are intended to guide appointment warrant doing so here.

57.     Consistent with the finding of the State Court, Webster has no trust and confidence in the ability of Messrs. Moser and Wallick to carry out the fiduciary duties they owe to the Debtors' estates and their creditors. Both have proven their inability to do so prior to the Petition Date, and now suffer from fatal conflicts of interest in reviewing such conduct and the resulting estate claims against themselves. Webster's concern is that Messrs. Moser and Wallick will instead be inclined to focus on shielding themselves from liability, thus negatively impacting how the estates are managed and maximized for the benefit of creditors. It goes without saying that an independent trustee should be appointed under section 1104(a)(2) of the Bankruptcy Code where, as here, a debtor and/or its management and insiders suffer(s) from material conflicts of interest and cannot be trusted to conduct independent investigations of transactions (fraudulent or otherwise) in which they were involved. *See, e.g.*, *In re PRS Ins. Group, Inc.*, 274 B.R. 381, 389 (Bankr. D. Del. 2001) (appointment of trustee appropriate under section 1104(a)(2) where causes of action against insiders are a significant asset of the estate).

58.     What is more, hypothetically replacing Mr. Moser with a new chief restructuring officer does not resolve the need for a Chapter 11 trustee. One, such replacement cannot bandage over the mandatory requirement for a Chapter 11 trustee under section 1104(a)(1) where, as here, fraud, dishonesty, incompetence and gross mismanagement were all present and accounted for prior to the Petition Date. Two, Mr. Wallick is a party to the improper conduct, so mere

replacement of the CRO still leaves him on the scene and in a position to select his own, handpicked quasi-trustee. Questions will linger whether the replacement CRO is truly acting as estate fiduciary and maximizing estate value for all creditors, and with Mr. Wallick hovering over the estates there is no real protection against further misconduct. A CRO, whether of a new stripe or old, is not tantamount to that of a truly independent fiduciary for the benefit of creditors—a Chapter 11 trustee.

59.     Finally, the benefits of appointing a Chapter 11 trustee generally, and Mr. DiOrio as the Chapter 11 trustee specifically, far outweigh the costs. Foremost, the appointment of a Chapter 11 trustee will provide creditors with the reassurance that a fair and independent fiduciary is finally managing the Debtors. This material benefit does not mean the estates will be shackled with inordinate administrative burdens. The Debtors' business and capital structure is not complex. If Mr. DiOrio is selected as the Chapter 11 trustee, there would be no expensive learning curve to be borne by the Debtors' estates as Mr. DiOrio has been on the ground for months.[24] Mr. DiOrio knows the Debtors' business, has extensive knowledge of their books and records, and combined with his professional background, is well positioned to investigate and possibly recover additional value for creditors. This result, in turn, would enable an efficient and equitable resolution of these Chapter 11 Cases for all parties in interest.

## CONCLUSION

**WHEREFORE**, Webster respectfully requests in the first instance that the Court enter its order, substantially in the form attached hereto as **Exhibit A**, granting (a) the Motion and dismissing each of the Chapter 11 Cases as bad faith filings under section 1112(b) of the Bankruptcy Code; and (b) Webster such other and further relief as the Court may deem

---

[24] Notably, the Debtors were provided an opportunity to object to Mr. DiOrio's (then, the Examiner) appointment as a temporary receiver at the June 25, 2020 hearing. The Debtors declined to do so, stating "[w]e have every confidence in him." Hr'g Tr. 20-3-4.

appropriate.  <u>Alternatively</u>, Webster respectfully requests that the Court enter its order (a) directing the U.S. Trustee, after consultation with Webster, to appoint one disinterested person as Chapter 11 trustee in these Chapter 11 Cases under section 1104(a) of the Bankruptcy Code; (b) directing the U.S. Trustee to seek approval of such appointment from this Court in accordance with section 1104(d) of the Bankruptcy Code and Bankruptcy Rule 2007; (c) directing the Debtors, Mr. Moser, Mr. Wallick, and any other individual or entity in possession of the Debtors' records and property to cooperate with the Chapter 11 trustee and immediately turn over to the Chapter 11 trustee all records and property of the estate in their possession or control as directed by the Chapter 11 trustee; and (d) granting Webster such other and further relief as the Court may deem appropriate.  In the event the Court directs the appointment of a Chapter 11 trustee, Webster strongly prefers the appointment of Mr. DiOrio as Chapter 11 trustee for the reasons provided in the Motion.

## <u>NOTICE</u>

Notice of this Motion will be separately provided to: (i) the U.S. Trustee; (ii) counsel to the Debtors, c/o Jeffrey A. Wurst and Jack Dayon, Armstrong Teasdale LLP, 919 Third Avenue, 37th Floor, New York, NY 10022 (jwurst@atllp.com and jdayton@atllp.com), and Erin M. Edelman, Armstrong Teasdale LLP, 7700 Forsyth Boulevard, Suite 1800, St. Louis, MO 63105 (eedelman@atllp.com); (iii) holders of the 20 largest unsecured claims against the Debtors on a consolidated basis; and (iv) any party that has requested notice pursuant to Bankruptcy Rule 2002.

Dated: June 29, 2020

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

By: _/s/ Craig A. Wolfe_____
Jonathan K. Bernstein
Craig A. Wolfe
Jason R. Alderson
101 Park Avenue
New York, NY 10178
Telephone:  (212) 309-6000
jonathan.bernstein@morganlewis.com
craig.wolfe@morganlewis.com
jason.alderson@morganlewis.com

_Counsel to Webster Bank, N.A._