Jeffrey A. Wurst
Jack Dayon (*pro hac vice* pending)
**ARMSTRONG TEASDALE LLP**
919 Third Avenue, 37th Floor
New York, NY 10222
Tel:    (212) 409-4400
Email: jwurst@atllp.com
        jdayon@atllp.com

Erin M. Edelman (*pro hace vice* pending)
**ARMSTRONG TEASDALE LLP**
7700 Forsyth Boulevard, Suite 1800
St. Louis, MO 63105
Tel:    (314) 621-5070
Email: eedelman@atllp.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ) | |
| ) | |
| In re: ) | Chapter 11 |
| ) | |
| PREMIERE JEWELLERY, INC, et al.,[1] ) | Case No. 20-11484 (JLG) |
| ) | |
| ) | (Joint Administration Requested) |
| Debtors. ) | |
| ) | |

**DECLARATION OF A. HOWARD MOSER**
**PURSUANT TO RULE 1007-2 OF LOCAL BANKRUPTCY RULES FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

I, A. Howard Moser, declare under penalty of perjury:

1.      I am the Chief Restructuring Officer of Premiere Jewellery, Inc. and affiliated

entities ("Premiere," or and together with its debtor affiliates, the "Debtors" or the "Company").

I have served in this position since January 2020.

---

[1] The Debtors in these cases are each incorporated or organized in the state of Rhode Island, and along with the last four digits of each Debtor's federal tax identification number are: Premiere Jewellery, Inc. [0250]; Tanya Creations, LLC [1867]; PAW Holdings, Inc. [9043]; ETYM Properties, LLC [4377]; and PJT, LLC [3105]. The address of the corporate offices of Premiere Jewellery, Inc. is 389 Fifth Avenue, New York, NY 1016 and the other Debtors' corporate headquarters is 360 Narragansett Park Drive, East Providence, RI 02916.

2.      In such capacity, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I am above 18 years of age, and I am competent to testify.

3.      I submit this declaration (the "Declaration") to assist this Court and parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of: (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on June 25, 2020 (the "Petition Date"); and (b) the emergency relief that the Debtors have requested from the Court pursuant to the motions and applications described herein.

4.      Except as otherwise indicated, the facts set forth and circumstances described in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and prior restructuring initiatives, and/or my opinions based upon my experience and knowledge. If I were to be called as a witness, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

5.      This Declaration is intended to assist the Court in understanding the Debtors' prepetition organizational structure and circumstances leading to the Debtors' decision to seek relief under chapter 11 of the Bankruptcy Code. This Declaration is organized and proceeds as follows: (I) Company Overview; (II) Organization and Capital Structure; (III) Events Leading to Chapter 11 Bankruptcy; and (IV) First Day Motions. Schedules 1 through 12, which contain the requirements pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York, are attached hereto.

## I.    Company Overview

6.      Founded in 1978, Premiere and its affiliates are a family-owned and operated fashion jewelry design, sales, and distribution enterprise with corporate offices located in New York, NY and other offices and operations located in East Providence, Rhode Island, and Qingdao and Yiwu, China. Peter Wallick is the principal equity holder and serves as Chief Executive Officer, and as of the Petition Date, the Debtors employ 37 personnel.

7.      The Debtors design and distribute costume jewelry and hair goods and partner with major retailers, who then sell the Debtors' merchandise to consumers. The Debtors' retail partners have included multiple major brick-and-mortar retailers and department stores, including amongst others, JCPenney, Burlington, Charming Charlie, Stage Stores, and Kohl's. Third party suppliers located in China, Vietnam, and India manufacture the Debtors' merchandise, which includes necklaces, earrings, bracelets, rings, and other fashion jewelry and accessories.

8.      The Debtors' facility in East Providence, Rhode Island houses offices and the Debtors' main warehousing and distribution activities. Depending upon the season, the distribution center typically operates five (5) days per week, but during peak shipping season, the distribution center may operate six (6) days per week. The operation currently employs 11 active personnel (with 26 other employees on furlough), plus additional temporary labor during peak periods.

9.      During peak periods, merchandise receipts from the Debtors' overseas suppliers are often processed for customer shipment shortly after arrival at the facility. Processing can include carding or tagging inventory with customer names, and other forms of packaging, as required by the customer. Most customers then require shipments to their respective distribution

3

centers, and some customers require shipping directly to their retail stores. Additionally, the Debtors are responsible for fulfillment of orders placed by consumers through ecommerce platforms. The Debtors ship these orders directly to the consumer.

10.     The Debtors manually track the inventory movement. Cycle counts are typically performed monthly and full inventory counts are performed annually, typically during the month of July.   Notwithstanding, the Debtors performed a complete inventory in May 2020.

11.     In addition to housing distribution and corporate office activities, the East Providence facility also hosts the Debtors' product design and development capabilities. The Debtors create sample items both for customer orders and for internal product development, which are then sent overseas to third-party manufacturers for mass production.

12.     The Debtors' sales volume fluctuates depending on the season. The Debtors' low selling period stretches typically from November through July, and the Debtors' high selling period is typically from August to October. Approximately 41 percent of the Debtors' revenue is generated from August to October, or 75 percent in the second half of the year, typically when retailers experience their highest volume of sales.

## II.     Organization and Capital Structure

13.     The Debtors corporate organization chart is attached hereto as **Exhibit A**. EVTYMA, LLC is not a debtor in these chapter 11 proceedings.

14.     The Debtors' prepetition capital structure includes approximately $12.5 million in outstanding debt as of the Petition Date, consisting of approximately $9.5 million in secured debt.

## A.      *The Revolving Loan Agreement*

15.      Webster Bank, National Association ("Webster" or "Lender") has served as the principal lender supporting the Debtors' business operations since 2007.   Since that time, working capital has been provided through a revolving credit facility consisting of that certain Revolving Credit Note made by Tanya Creations, Inc. (now known as PAW Holdings, Inc., a debtor in the above-captioned cases ("PAW")) in favor of Lender in the maximum principal amount of $11 million, dated April 19, 2007, as amended from time to time (the "Revolving Note"), evidencing a certain revolving line of credit loan (the "Revolving Loan") provided pursuant to that certain Loan Agreement as amended from time to time (the "Revolving Loan Agreement"), entered into by and between PAW, as the borrower, and Lender, dated April 19, 2007.

16.      The Debtors' obligations under the Revolving Note and Revolving Loan Agreement are secured by substantially all assets of PAW pursuant to the terms and conditions contained in that certain Security Agreement by and between PAW and Lender, dated April 19, 2007 (the "Revolving Loan Security Agreement"). Lender perfected its security interests by having filed UCC-1 Financing Statements with the Rhode Island Secretary of State on April 20, 2007.

17.      The Revolving Note and Revolving Loan Agreement are guaranteed by ETYM Properties, LLC ("ETYM") pursuant to that certain Guaranty, dated April 19, 2007 as amended from time to time, and by Premiere (collectively with ETYM, the "Revolving Loan Guarantors") pursuant to that certain Guaranty, dated September 9, 2010 as amended from time to time (collectively, the "Revolving Loan Guarantees").

18.     The Revolving Loan requires, *inter alia,* that customers make their payments to a lockbox under the direct control of the Lender.  Customer payments would then reduce the balances owed to the Lender.  As new sales were effected and accounts receivable created and/or inventory acquired, funds would then become available to be advanced to the Debtors as revolving loans.

19.     The Revolving Loan Agreement matured on March 31, 2020 (the "Maturity Date"). Pursuant to a demand letter dated April 10, 2020, the Lender asserted that it was owed the principal amount of $8,008,273.99 under the Revolving Loan. Since that date, no advances have been made to the Debtors except for advances made on or about April 10, 2020, in the approximate amount of $53,000.00, to cover payroll for the period ending April 4, 2020**.** It is my understanding that since the Maturity Date, the Lender has received customer payments.

**B.     The Term Credit Agreement**

20.     Lender is also the holder of that certain Secured Promissory Note dated December 11, 2015, and made by Tanya Creations, Inc. (now known as PAW) in favor of Lender in the maximum amount of $325,000, (the "Term Note"), evidencing that certain term loan (the "Term Loan") pursuant to that certain Loan Agreement (the "Term Credit Agreement"), entered into between PAW, as the borrower, and Lender, dated December 11, 2015.

21.     The Debtors' obligations under the Term Note and Term Credit Agreement are secured by substantially all assets of PAW pursuant to the terms of that certain Security Agreement by and between PAW and Lender, dated December 11, 2015 (the "Term Loan Security Agreement"). Lender filed UCC-1 Financing Statements with the Rhode Island Secretary of State on December 14, 2015.

22.     The Term Note and Term Credit Agreement are guaranteed by ETYM pursuant to that certain Guaranty, dated December 11, 2015 and by Premiere (collectively with ETYM, the "Term Loan Guarantors") pursuant to that certain Guaranty, dated December 11, 2015 (collectively, the "Term Loan Guarantees").

23.     Pursuant to a letter dated April 10, 2020, the Lender asserted that due the Debtors' failure to pay the balance owed under the Revolving Loan, it was demanding payment of balance owed under the Term Note.  Although the Lender did not specify the amount it was claimed to be owed, I reasonably believe the principal balance owed under the Term Loan to be in the amount of $37,916.49.

### C.     The Real Estate Loan Agreement

24.     Lender is also the holder of that certain Secured Promissory Note made by ETYM in favor of Lender in maximum amount of $1.735 million, dated September 26, 2017 (the "Real Estate Note"), evidencing a certain real estate term loan (the "Real Estate Loan") pursuant to a certain loan agreement (the "Real Estate Loan Agreement"), entered into between ETYM, as the borrower, and Lender, dated September 26, 2017.

25.     The Real Estate Note and the Real Estate Loan Agreement are secured by a mortgage covering the real property known as 360 Narragansett Park Drive, East Providence, RI 02916 (the "Premises"), and, among other collateral, any improvements, easements, personal property and fixtures, and equipment in connection with the real property, as fully set forth in that certain Mortgage and Security Agreement by and between ETYM and the Lender, dated and recorded on September 26, 2017 (the "Mortgage"). Lender also filed UCC-1 Financing Statements with the Rhode Island Secretary of State on September 26, 2017.

7

26.     The Real Estate Note and Real Estate Loan Agreement are guaranteed[2] by:

    a.  Peter A. Wallick pursuant to that certain Guaranty, dated September 26, 2017;

    b.  PJT, LLC pursuant to that certain Guaranty, dated September 26, 2017; and

    c.  Premiere (collectively with Peter A. Wallick and PJT, LLC, the "Real Estate Loan Guarantors") pursuant to that certain Guaranty, dated September 26, 2017 (collectively, the "Real Estate Guarantees").

27.     Pursuant to a letter dated April 10, 2020, the Lender asserted that due to the Debtors' failure to pay the balance owed under the Revolving Loan, it was demanding payment of balance owed under the Real Estate Loan.  Although the Lender did not specify the amount it was claimed to be owed, I reasonably believe the principal balance owed under the Real Estate Loan to be in the amount of $1,510,895.73. The scheduled monthly payments of principal and interest are in the amount of $11,643.00 per month.

28.     ETYM also has an outstanding mortgage loan from Business Development Company of Rhode Island ("BDC") in the original principal amount of $400,000.00 and a current principal balance in the amount of $353,331.00,  plus $9,481.52 in interest as of June 9, 2020 and $1,468.08 in late fees as of June 19, 2020.   The scheduled monthly payments of principal and interest are in the amount of $6,667.00.

29.     The Premises were appraised at $2.8 million in October 2019 although it is the Company's perception that values have dropped since that time.  Even so, there is substantial equity for Webster so even with a diminution of value, Webster should not require adequate protection payments.  However, inasmuch as BDC is in the junior position and any diminution of

---

[2] Jeffrey Massotti, the former president of the Debtors was released from his guaranty after he separated from the company.

value would affect them, the Debtors are proposing making monthly adequate protection payments of the scheduled amount of $6,667.00.

### D.    Trade Claims

30.    In addition, the Debtors have approximately $3.2 million in past due trade claims. In the Critical Vendor Motion, filed simultaneously herewith and as more fully set forth therein, the Debtors seek to pay, over time, an amount not to exceed $2.0 million to certain Critical Vendors and Carriers, as further described in the Critical Vendor Motion.

## III.   Events Leading to Chapter 11 Bankruptcy

31.    A culmination of events led to the Debtors' chapter 11 filing. Like other companies supporting the retail industry, the current retail environment, taken together with the onset of the COVID-19 pandemic, resulted in a substantial and immediate loss of revenue for the Debtors and presented unprecedented challenges. Furthermore, negotiations between the Debtors and Webster to allow for continued advances under the Revolving Credit Loan and the continuation of the Real Estate Loan and the Term Loan, stalled. Webster, without any advance notice to the Debtor, demanded payment of all obligations and instituted receivership proceedings against the Debtors and related parties, in the Superior Court for the State of Rhode Island. As a result, in order to save their business and protect their employees and other constituents, the Debtors were left with no other option but to file for chapter 11 bankruptcy protection.

### A.    Decline of the Debtors' Retail Partners

32.    Last fall, Peter Wallick, the Chairman and CEO, became concerned that Webster would not renew their credit facilities when the then term expired on March 31, 2020.  This concern was based on the stress in the retail industry which fueled the Debtors' business.  Major

retailers such as Sears and others had fallen into bankruptcy and others were quickly following. As a result lenders were shying away from lending against receivables owed by retailers – especially those that were not *grade A* credits. Mr. Wallick approached me to assist with securing replacement financing in the event Webster would not renew the credit facility which had been in existence since 2007.

33.     Shortly after I was engaged as a consultant to assist in securing new financing, in July 2019, Charming Charlie, one of the Debtors' largest customers, filed for chapter 11 bankruptcy protection, exiting the market and leaving the Debtors at risk for recovering on $1.2 million in accounts receivable. The Debtors conducted business with Charming Charlie for approximately seven (7) years and generated $5 to $7 million annually from that business relationship. Later in 2019, two of the Debtors' other retail partners, Dress Barn and Avenue, also exited the market.

34.     In early 2020, the Debtors' business took a turn for the worse due to the overall declining retail climate, coupled with the onset of the COVID-19 pandemic. Strict social distancing guidelines and "stay-at-home" orders forced nonessential retailers to temporarily close their doors, further devastating already-struggling retailers and leading to an uptick in bankruptcy filings. The challenges confronting brick-and-mortar retail led to the demise of several retail giants and certain of the Debtors' retail partners, including JCPenney and Stage Stores, which also sought chapter 11 protection. The struggles confronting the Debtors' retail partners had a trickle-down impact on the Debtors' operations as well as their global supply chain partners. Declining retail sales, and specifically, a decline in the sale of the Debtors' merchandise, resulted in an overall loss of revenue for the Debtors in excess of $10,000,000. Moreover, substantially all retail accounts unilaterally imposed 120 – 150-day payment terms on

all money owed to the Debtors.   The result was an immediate shutdown of all cashflow and payments on account.

35.    COVID-19 also caused the Company to reconsider its strategy in New York. The Company has invested significant financial resources in opening and maintaining its New York showroom. However, with the onset of COVID-19, in combination with little net financial gain from the showroom, the Company is being forced to weigh its options moving forward with the showroom, with the safety of the Company's employees and customers being of utmost priority. The Company is in discussions to relocate its showroom to a modern "shared space" and envisions reopening its important New York presence by August 2020. The new location will enable us to conduct business in a safe environment.

36.    Even with COVID-19 and the overall general decline of retail, the Debtors remain focused on collections and servicing their top selling retailers, which has enabled the Debtors to open new and profitable opportunities with their existing accounts and through the acquisition of two new licensed brands. As of June 1, 2020, all retail accounts have restored normalized payment terms.   In 2020, the Debtors are actively selling to nearly a half-dozen new accounts including national retailers and with stronger financial profile. One of the nation's top and most profitable retailers has already issued the Debtor a new vendor number for 2021 and committed to them as a new vendor.   Additionally, the Debtors have established through a joint venture partnership, a new brand shop on Amazon that launched on Black Friday in 2019 and to-date sales have increased more than thirty percent.   Finally, the Debtor was also one of 200 new brands, the only costume jewelry brand, selected and invited by Alibaba to onboard as of June 1, 2020, thereby continuing to lessen the Debtor's dependence on traditional brick and mortar retailing.

### B.    *Discovery of and Adjustment for Overstated Collateral*

37.    The greatest challenge I have faced since coming to the Debtors has been setting straight the collateral that supports the Lender's prepetition loans.

38.    During the period from 2016 through 2018, Peter Wallick was absent from the business being treated for cancer.  This was the first time in the 42-year history of the Company that Mr. Wallick was not active in the day-to-day business and was unable to contribute to design, call on accounts, visit market week or attend sales meetings. In preparation for his absence, he hired a president to operate the company and oversee sales. During his tenure, the company's expenses escalated and many of the top accounts refused to work with him at the helm.  This person was terminated in September of 2018.

39.    During the summer of 2019, the Debtors initially engaged me as an independent consultant to assist in: (a) sourcing and evaluating new or alternative capital sources; (b) helping to recover money owed by Charming Charlie and supervise a lawsuit against to recover such funds; (c) identifying cost savings opportunities, efficiencies or opportunities to increase profitability; and (d) to introduce new, creditworthy customer accounts.  Although I was successful in introducing them to potential lenders, they were not comfortable with the accounting practices and skill set of the then finance and risk management staff.  After the Charming Charlie bankruptcy filing, my consultant role expanded to provide advice on impending financial risks from the declining retail environment upon which the Debtors rely upon and to install industry leading best practices, collection procedures and risk management guidelines.  In the fall of 2019, the chief financial officer was terminated, and the accounting functions were then supervised by the controller.

40.    My role as an independent contractor was changed to that as an employed restructuring officer effective January 20, 2020.  My initial focus was to review the companies' processes and to evaluate and subsequently establish *best practices rooted in preservation of capital*.  My observation from the outset was that the account receivables were comprised of high-risk accounts and heavily concentrated to high risk and "declining" retailers.  For example, I was surprised to learn that the borrowing base certificate presented to the Lender included accounts owed by Sears, which was in bankruptcy and should not have been included to determine borrowing availability under the Revolving Loan.  Moreover, I became immediately concerned with the "practices" employed by the prior Finance and Accounting management team and lack of credit, collection, analytical and necessary skill sets or relevant experience required for a company of our nature and in today's retail environment.

41.    I engaged an accounts receivable management and independent collections firm to assess the collectability of the accounts. As a result of its study, in consultation with our independent accounting firm, we wrote down the accounts receivable to an accurate, net realizable amount.  Further, I also immediately directed an RFP process widely soliciting top industry collection firms to partner with us in collections and development of best practices.

42.    We requested an immediate meeting with the Lender and met with them on February 25, 2020 at which time we advised the Lender that the prior reports presented to the bank significantly overstated the collateral value.   At my instruction we did not issue a borrowing base certificate at the end of February and would not until I was comfortable that we could issue one that contained accurate and reliable information.

43.    On March 12, 2020, Peter Wallick, the companies' accountant and I met with the Lender's senior officers at our accountants' office at which time we discussed in detail the

Company's 2019 performance as well as details concerning my findings in connection with the value of the accounts receivable. Peter Wallick and the accountant met again with the Lender's senior officers on March 17, 2020 (also at the accountants' offices). At each of these meetings information was provided to the Lender disclosing the significant estimated write-down of collateral that would be forthcoming.

44.     On March 31, 2020, we delivered a borrowing base certificate to the Lender, in line with previous estimates communicated to the Lender, which further illustrated that the Revolving Loan was some $4 million in excess of the availability authorized under the Revolving Loan Agreement. This was primarily due to a write-down of the gross accounts receivable as reported as of January 31, 2020 in the amount of approximately $8.5 million to approximately $3 million as reflected in the borrowing base certificate as of March 28, 2020.

45.     Despite having been advised in advance of this situation the Lender was clearly angry. We suggested that the Lender continue to provide funding going forward and we would negotiate a schedule to bring the loan back into the borrowing formula. The Lender requested substantial documentation which was promptly provided. However, instead of using the information to consider a workout strategy of the now distressed loan, the Lender commenced a proceeding for the appointment of a receiver.

46.     On May 20, 2020, we conducted a full physical inventory, the result of which was a write-down of the inventory from approximately $2.2 million to $1.3 million. Actual shrink was minimal and in-line with industry averages. However, in order to reflect a proper net realizable value given inactive retail accounts, I also wrote down certain aged inventory that was no longer associated with these accounts.

### C.     Webster Bank and the Receivership Proceeding

47.    As of March 31, 2020, Webster asserted that the amount of $8,008,274 remains outstanding under the Revolving Loan Agreement and declared the Debtors in default. Webster asserts that due to the nonpayment of obligations pursuant to the Revolving Loan Agreement, the Real Estate Loan Agreement and Term Credit Agreement are also in default, and the amounts of $1,518,125 and $43,333, respectively, have been accelerated and are currently due and payable.

48.    With the Debtors approaching the most profitable time of the year in the upcoming months, the Debtors attempted to negotiate a forbearance agreement or other similar resolution with Webster, to allow the Debtors access to additional cash to continue its operations; however, the parties were unable to arrive at mutual terms.

49.    After negotiations between the Debtors and Webster stalled, as further described above, on April 10, 2020, Webster filed the Petition against PAW Holdings, Inc., Tanya Creations, LLC, ETYM, Premiere, and PJT, LLC (collectively, the "Respondents") for the Appointment of a Receiver in the Superior Court of the State of Rhode Island (the "Rhode Island Court"), requesting that the Rhode Island Court appoint a receiver to take control of the assets, affairs, estate, effects, and property of the Respondents (the "Receivership Proceeding"), which the Debtors opposed.

50.    Following a virtual hearing, the Rhode Island Court declined to appoint a receiver but did, on April 22, 2020, issue the Order Appointing Examiner, appointing Joseph M. DiOrio, Esq. as examiner (the "Examiner") of Respondents to assess the Respondents' finances, operations, revenue, and obligations to Webster and other creditors. Respondents are required to provide the Examiner with complete access to their books and records in order to prepare a report.  The Examiner was also charged with requesting an immediate conference with the Rhode Island Court should he discover irregularities that would put Webster's collateral at risk.

In the nearly two months since his appointment, the Examiner did not request any conference with the Rhode Island Court. Notwithstanding, prior to the Examiner completing his report, Webster made a renewed motion for the appointment of a receiver. After notice and a hearing, on June 25, 2020, the Rhode Island Court granted Webster's renewed motion and appointed Joseph M. DiOrio, Esq. as a receiver to take control of the Company's assets, thereby prompting an emergency filing of these chapter 11 cases.

51.     During this process, the Debtors succeeded in obtaining funding under the Paycheck Protection Program (the "PPP") provided for under the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") and has been able to operate on a limited basis only with the PPP funding.

52.     Despite attempts to avoid the necessity of this chapter 11 proceeding, the Debtors and the Lender have been unsuccessful in achieving a resolution that would enable the business to continue to operate with funding from the Lender.

53.     The collateral reporting has been cleaned up and is now in good shape. Orders for the holiday season are expected to arrive in the next month or so and pre-order discussions forecast that sales for the second half of 2020 will be robust and in the range of $13 million and exceeding our expectations. Despite the distress in the retail marketplace several new lenders have indicated a willingness to support us which will enable the Debtors to reorganize and emerge from chapter 11 with a new life. Our existing subordinated Lender has also expressed its confidence in Mr. Wallick and me in our collective ability to positively impact the turnaround.

### D.     *Securing DIP Financing in Advance of the Chapter 11 Proceedings*

54.     I introduced the Debtors to a number of potential lenders. Initially, we were able to secure a revolving line of credit from Context Credit Holdings, LP. After the accounting

issues were discovered we pursued Context. We had suggested to Webster that Context provide a revolving line of credit with an initial advance to be used to pay off that part of the Webster credit facility that was fully secured and that we term out the "unsecured" balance over several years based on the company's performance. Webster never responded to our proposal and, instead, terminated the credit facility on March 31, 2020, the termination date under the loan agreements, and as described above, commenced the Receivership Proceeding.

55.    With the onset of the holiday selling season quickly approaching, we accelerated our plans to enable us to capitalize on the upcoming season to put our business back in order. We approached numerous lenders seeking debtor-in-possession financing because it appeared that Webster was unwilling to enter into any arrangement that would allow us to operate outside bankruptcy and was only focused on liquidating the business—even with a great loss on their loan.

56.    We met with a great number of lenders including but not limited to People's United Bank, Sterling Bank, Atalaya Capital, Rosenthal, Inc., Hitachi Business Credit, Prestige Capital, Cutterbuck Capital, SG Credit Partners, Sallyport Capital Finance, Republic Business Credit, King Trade Capital ("KTC"), and Factors Southwest L.L.C. ("FSW" or "Factor"). However, the Debtors and their advisors only received term sheets from a select few. After securing term sheets and legal documents from several proposed debtor-in-possession lenders and purchase order finance lenders, preparations for a bankruptcy filing were commenced. These lenders and KTC provided loan documents, the terms of which were acceptable to the Debtors. However, upon the actual bankruptcy filing, each of the proposed debtor-in-possession lenders determined not to proceed. KTC remained committed to provide the PO Finance Facility (as defined in the DIP Financing Motion). Ultimately, the Debtors received favorable terms

from FSW, who promptly stepped up and worked through the weekend to approve the DIP

Factoring Facility (as defined in the DIP Financing Motion).  As such, the proposed debtor in

possession financing was prepared on an emergency basis with very little lead time to plan and

negotiate. Due to the Company's financial position and the current retail climate, the Debtors had

limited options to secure an adequate amount of financing on an expedited basis. In light of the

exigencies, the Debtors and their advisors concluded that Factor's terms were favorable to the

Debtors and in the best interests of the parties in interest and their stakeholders.

57.     The influx of retail bankruptcies and its impact on the retail supply chain resulted

in the Company falling behind in paying our vendors.  In particular, the Company owed

substantial amounts to the factories in China that manufacture the products the Company sells to

our retail customers, as well as the logistics and freight forwarders that support the supply chain.

In order to induce the factories and supply chain to continue to support the Company, we agreed

that we would seek "critical vendor" status for the most critical of our vendors.  In order to

provide us with capital to support our critical supply chain, the Company sought and obtained

approval for purchase order financing to enable the Company to accelerate payments to the

critical suppliers that would, in turn, assure their ability to continue to provide us with product to

sell to our retailers.

58.     The Company's timing to commence these proceedings was calculated to enable

us to capitalize on our retail customers' needs to secure product for their busiest season.  Those

orders typically are received in June but based on the retail closures we projected them to arrive

in July.  All indications are that our retail customers need product from us and have assured us

that orders are about to be committed and will be received by us on an accelerating basis over the

next several weeks. All indications are that these orders will result in sales in excess of $13 million before the end of this calendar year.

59.    In order to fulfill the Company's orders, the Company will not only need to acquire new product from our overseas factories, but we will need to utilize our existing inventory which is collateral to Webster Bank. We understand that Webster will be entitled to receive adequate protection payments for any diminution in value of its inventory collateral. The Webster credit facility provided that Webster advanced 35% of the cost value of our prepetition inventory. On May 20, 2020, we conducted a complete inventory of the goods in our facility, all of which is collateral to Webster's prepetition loan. In addition, we retained HILCO Valuation Services to appraise the inventory. That inventory at cost is valued at $1,145,000.00. The HILCO Valuation Services' appraisal placed a value on the inventory at: $273,000.00 (gross forced liquidation value), with liquidation expenses in the amount of $187,000.00, thus resulting in a net forced liquidation value in the amount of $85,000.00, or 7% of cost. Inasmuch as if Webster (or a chapter 7 trustee) were to liquidate the Webster Inventory Collateral, such liquidation would most likely be through an auction as described in the appraisal. Accordingly, we propose that this Court determine that Webster will be adequately protected by the Company paying them a net forced liquidation value of 7% of cost for the use of their prepetition inventory.

60.    Historically, our sales are fulfilled using about 90 percent of newly acquired inventory from our factories in China and about 10 percent from the inventory in our warehouse facility. Accordingly, the Company will track post-petition inventory separately from Webster's prepetition inventory collateral. In addition, the Company will provide monthly reports of the Webster prepetition inventory used to fulfill orders and provide that report to Webster on a

monthly basis together with its adequate protection payments. The Debtors submit that such treatment is fair and reasonable and will provide Webster with its indubitable equivalent value of its prepetition inventory collateral.

## IV.    First Day Motions

61.    The Debtors have filed a number of First Day Motions, consisting of administrative motions and other motions relating to the Debtors' business operations. The Debtors submit, and I agree, that approval of each First Day Motion is a critical element of their reorganization efforts and is necessary to ensure a smooth transition into chapter 11 with minimal disruption to their operations.

62.    I have reviewed each of the First Day Motions or had their contents explained to me, including the exhibits thereto, and believe that the Debtors would suffer immediate and irreparable harm absent the ability to continue their business operations, as requested in the First Day Motions. Information with respect to each First Day Motion is provided below and additional detail is contained in each First Day Motion. Capitalized terms, to the extent not otherwise defined herein, have the meanings provided in the respective First Day Motions.

### A. *The Joint Administration Motion* [Docket No. 2]

63.    The Debtors request this Court approve the joint administration, on a procedural basis only, of their five (5) chapter 11 cases and designate *In re Premiere Holdings, LLC* as the lead case. My understanding is that no party's substantive rights will be adversely impacted if the cases are jointly administered. Given the integrated nature of the Debtors' business operations, joint administration of the Debtors' cases will promote efficiency and ease the administrative burden on this Court and all parties-in-interest. Furthermore, the Debtors' business operations and financial affairs are closely related, and the relief sought in forthcoming motions will be

applicable to each Debtor. Consolidating the cases on a procedural basis will streamline these cases, resulting in a cost-savings for the Debtors' estate. Accordingly, I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estate, creditors, and parties in interest.

**B. *The Creditor Matrix Motion* [Docket No. 3]**

64.     Pursuant to the Creditor Matrix Motion, the Debtors request the Court allow the Debtors to file and maintain a single consolidated list of creditors in lieu of filing separate creditor matrices for each Debtor; to allow the Debtors to file a consolidated list of top-20 largest unsecured creditors; and grant related relief.  I believe that the requested relief in the Creditor Matrix Motion is necessary for the efficient administration of these chapter 11 cases. Prior to the Petition Date, the Debtors maintained their books and records on a consolidated basis. Therefore, the preparation of separate creditor matrices and creditor lists would be time-consuming, unduly burdensome, and costly to the Debtors' estates. Accordingly, I believe that the relief requested in the Creditor Matrix Motion is appropriate in these chapter 11 proceedings.

**C. *The Schedules and Statements Extension Motion* [Docket No. 10]**

65.     Pursuant to the Schedules and Statements Extension Motion, the Debtors request this Court's approval to extend the deadline to file the Schedules and Statements from July 9, 2020 through and including July 23, 2020. Due the emergency filing of these chapter 11 cases and the Company's focus on obtaining first day relief and stabilizing operations, the Debtors request additional time to prepare the Schedules and Statements. Accordingly, I believe good cause exists to grant the relief requested in the Schedules and Statements Extension Motion.

**D. *The Employee Wages and Benefits Motion* [Docket No. 14]**

66.     The Debtors request authority, but not direction, to pay certain prepetition amounts, and maintain and continue to honor and pay, all amounts with respect to the Debtors' business practices, programs, and policies for their employees as such were in effect on the Petition Date and as such may be modified or supplemented from time to time in the ordinary course of business as provided in the motion, including, among other related expenses, unpaid wages, payroll taxes and fees, and other amounts related to employee benefit programs. The payment of such amounts is critical to the ongoing operations of the Company. Therefore, I believe that the relief requested in the Employee Wages and Benefits Motion is appropriate.

### E. *The Cash Management Motion* [Docket No. 7]

67.     Pursuant to the Cash Management Motion, the Debtors seek the entry of interim and final orders authorizing, but not directing, the Debtors to, among related relief, (a) continue to operate the Cash Management System, (b) honor certain prepetition obligations related thereto, (c) maintain existing business forms, and (d) continue to maintain business relationships with each other consistent with historical practice.

68.     The Cash Management System is vital to the Debtors' ability to conduct business throughout the United States and in foreign markets. It helps control funds, serves as a repository for cash receipts, manages cash disbursements, ensures cash availability for each of the Debtors, and reduces administrative expenses by facilitating the movement of funds among multiple entities by centralizing cash operations. Any disruption of the Cash Management System would have an immediate adverse effect on the Debtors' business operations to the detriment of their estates and stakeholders, as their business requires prompt access to cash and accurate cash tracking, particularly with respect to global merchandise flows. Accordingly, to minimize disruption caused by these chapter 11 cases and to maximize the value of the Debtors' estates,

the Debtors request authority to continue to utilize their existing Cash Management System during the pendency of these chapter 11 case.

69.    Furthermore, prior to the Petition Date, the Debtors utilized form documents when conducting business, including but not limited to letterhead, checks, invoices, and purchase orders. The Debtors request this Court's authority to allow the Debtors to continue using existing business forms. Printing new forms with the label "debtor in possession" would prove costly to the Debtors' estates.

70.    Accordingly, I believe that the relief requested in the Cash Management Motion is necessary to continue the Debtors' operations, preserve the value of the Debtors' estate and is in the best of interests of the creditors and stakeholders.

### F. *The DIP Financing Motion* [Docket No. 9]

71.    Pursuant to the DIP Financing Motion and as further described above, the Debtors seek entry of interim and final orders authorizing the Debtors, among other related relief, to obtain post-petition financing and use of cash collateral.

72.    The Debtors have an immediate and critical need for post-petition financing. The Debtors have confronted liquidity constraints and revenue losses stemming from the COVID-19 pandemic and the overall decline of retail. Moreover, as described above, Webster has been unwilling to negotiate a resolution with the Debtors that would enable the business to continue to operate with funding from Webster. As a result, the Debtors require post-petition financing from the DIP Lender(s) (as defined therein) in order to continue their operations during this chapter 11 process.

73.    The Debtors do not have sufficient available sources of working capital and financing to operate in the ordinary course of business without debtor-in-possession financing

and the authorized use of "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code.

74.    The DIP Lender(s) are willing to provide liquidity on the terms provided in the DIP Documents (as defined therein) and the interim and final orders. I understand the terms of the DIP Facilities (as defined therein) to be reasonable and customary in the context of debtor-in-possession financings of this type. I believe that the liquidity to be provided by the DIP Facilities (as defined therein), together with the use of cash collateral, will stabilize the Debtors' businesses and enable the Debtors to fund their operations during the course of these chapter 11 cases. Accordingly, I believe the relief requested in the DIP Financing Motion should be approved by the Court.

**G.  *The Critical Vendors Motion* [Docket No. 8]**

75.    Pursuant to the Critical Vendors Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to pay prepetition claims held by certain Carriers and Critical Vendors and approving the proposed Trade Agreement.

76.    The Debtors and their advisors have spent significant time reviewing and analyzing their books and records, reviewing contracts, and analyzing applicable law, regulations, and historical practice to understand the Debtors' critical business relationships—the loss of which would immediately and irreparably harm their business, by, *inter alia*, preventing the Debtors from supplying their retail partners with merchandise.

77.    The success of the Debtors' chapter 11 cases and effective reorganization depends significantly on the uninterrupted and consistent flow of inventory through its supply chain and distribution network, including the purchase, importation, and shipment of the Debtors' merchandise. The Debtors engage certain vendors to transport and deliver the Carrier Products

(as defined therein). The Carriers (as defined therein) regularly possess the Carrier Products belonging to the Debtors in the course of transporting and delivering the Carrier Products. The refusal of Carriers to deliver the Debtors' goods as a result of not being paid would be detrimental to the Debtors' operations and potentially cost the Debtors a substantial amount of revenue and future business. Furthermore, the Debtors rely on continued business with certain Critical Vendors (as defined therein), namely the factories manufacturing their merchandise, to fund their operations and sub-contractors. Failing to pay the Critical Vendors may cause certain Critical Vendors to refuse to manufacture and supply merchandise to the Debtors. More acutely in recent weeks any failure to pay the Critical Vendors coupled further as a result of the COVID-19 impact on the global supply chain, could lead to a greater, industry wide, inability to fund sub-contractors on a timely basis which could inevitably lead to further disruption to holiday sales and deliveries related thereto.

78.    Accordingly, I believe cause exists to grant the relief requested in the Critical Vendor Motion.

**H. *The Insurance Motion* [Docket No. 4]**

79.    Pursuant to the Insurance Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to (a) continue insurance coverage entered into prepetition and satisfy prepetition obligations, if any, related thereto in the ordinary course of business and (b) renew, supplement, or purchase insurance coverage in the ordinary course of business on a post-petition basis, as needed.

80.    I believe that continuation of the Insurance Policies and payment of the Premiums, Deductible Fees, and Brokerage Fees (each as defined in the Insurance Motion), as applicable, are essential to the preservation of the value of the Debtors' properties and assets.

Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Insurance Motion.

## Exhibit A

**Corporate Organization Chart**



**Schedule 1**

Committees

Pursuant to Local Rule 1007-2(a)(3), to the best of the Debtors' knowledge and belief, no committees have been formed prior to the Petition Date.

## **Schedule 2**

Consolidated List of 20 Largest Unsecured Creditors (Excluding Insiders)

Pursuant to Local Rule 1007-2(a)(4), to the best of the Debtors' knowledge and belief, the following table sets forth the 20 largest holders of unsecured claims on a consolidated basis (excluding insiders) and information required by Local Rule 1007-2(a)(4).

SCHEDULE 3

| Fill in this information to identify the case: |
|---|

Debtor Name    **Premiere Jewellery, Inc.**

United States Bankruptcy Court for the:   **Southern**   District of   **New York**
                                                                                    (State)

Case number (if known):  _____

q  Check if this is an
amended filing

## Official Form 204

### Chapter 11 or Chapter 9 Cases: Consolidated List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim: If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral | Unsecured claim |
| 1 AIXIN FASHION JEWELRY CO., LTD. DAGU RIVER INDUSTRIAL PARK LIGEZHUANG TOWN, JIAOZHOU QINGDAO, CHINA 266316 | Alice Zhang aixin@aixinjewelry.com 86-18364241815 | Trade | | | | 365,961.49 |
| 2 CONTEMPO CARD CO 69 TINGLEY STREET PROVIDENCE, RI 02903 | Adam Iacobucci adam@contempocard.com 4012724210 | Trade | | | | 352,562.57 |
| 3 DANCHIL JEWELRY CO. LTD #1326 YINHAI ROAD, YIDONG DISTRICT NIANSANLI TOWN, YIWU CITY, ZHEJIANG PROVINCE, CHINA | Dora Xiang dora@danchil.com 86 579 8999 6777 Ext: 8621 | Trade | | | | 311,258.22 |
| 4 E-LASTING ARTS AND CRAFTS CO., LTD. JAPAN INDUSTRIAL PARK LIGEZHUANG TOWN JIAOZHOU, QINGDAO, SHANDONG | Attn: Richard Fan elasting10@jz-ys.com 186 6179 7816 | Trade | | | | 286909.53 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral | Unsecured claim |
| 5  **American Express**  PO BOX 981531  EL PASO, TX 79998-1531 | **Matthew Yehle**  matthew.w.yehle@aexp.com  **1-800-528-2122** | Trade | | | | 223,564.25 |
| 6  **RED CHERRY JEWELRY MFG.**  **4TH FLOOR**  **#755 WEST XUEFENG ROAD**  **BEIYUAN STREET**  **YIWU CHINA 322000** | Claire Guo  claire@chinahyt.com  +86-21-6196-2555 | Trade | | | | 158917.29 |
| 7  **NEWLILAI CRAFTWORK CO., LTD.**  **NO 707 CHOUZHOU NORTH ROAD**  **JINMAO MANSION**  **YIWU CITY, CHINA 322000** | **Mona Huang**  sale17@cnbead.cn  86 579 85299506  **ALEN FENG**  86 18305890860 | Trade | | | | 120252.03 |
| 8  **YIWU SOQ JEWELRY CO., LTD.**  **2F, BUILDING NO13 SIHAI AVE**  **YIWU, CHINA**  **322000** | Attn: Julia Zhang  julia@soqjewelry.com  0532-80962575 | Trade | | | | 116011.68 |
| 9  **ICARE INDUSTRIAL LIMITED**  **ROOM 2105 JFZ833 TREND CENTRE**  **29-31 CHEUNG LEE STREET**  **CHAI WAN, HONG KONG** | **Geff Nee**  geffnee@icare-international.com  **86-591-8826-1907** | Trade | | | | 94,815.55 |
| 10  **YOOHAN VIETNAM ARTS CRAFTS CO., LTD.**  **DONG VAN I INDUSTRIAL ZONE**  **DUY TIEN DISTRICT**  **HA NAM, VIETNAM 30000** | Chris yoo  yoohan.vina@gmail.com  **0084-022-6358-3080** | Trade | | | | 94,733.33 |
| 11  **389 ASSOCIATES**  **C/O OLMSTEAD PROPERTIES**  **575 EIGHTH AVENUE-SUITE 2400**  **NEW YORK, NY 10018-3011** | DANIEL BREIMAN 212-564-6662-X220  Michelle Williams  mwilliams@olmstead | Trade | | | | 77,040.92 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim — If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral | Unsecured claim |
| 12 CHENJOO JEWELRY FACTORY 2ND FLOOR, BUILDING 1 #86 ZIAHE ROAD BEIYUAN INDUSTRIAL ZONE YIWU ZHEJIANG 322000 | Victor Yang VictorCJ@chenjoo.com 86-579-8559-6008 | Trade | | | | 66,014.76 |
| 13 SDC DESIGNS LLC 529, 5TH AVENUE, 16TH FLOOR NEW YORK, NY 10017 | Rowina Singh rowina@sdcdesigns.com 646-898-0850 | Trade | | | | 65,286.37 |
| 14 TAJMUN ARTS LLP R214, STREET #10, RAMESH PARK LAXMI NAGAR DELHI INDIA 110092 | Nazda Tajmun nazdatajmun@gmail.com 91-9582454408 | Trade | | | | 57,617.13 |
| 15 YIWU BIDIAN FASHION JEWELRY LTD 3RD FLOOR, PINK BUILDING, SHENGJIN #12, DANCHEN FIRST ROAD YIWU CITY, CHINA | Stanley li stanley@ywshijue.com 86-15825795927 | Trade | | | | 55887.19 |
| 16 BOW INDUSTRIAL CORPORATION 3-5 YANGJAE-DAERO60-GIL SONGPA-GU SEOUL, KOREA | Eric Choi eric@bowjewel.com 82-2-400-8885 Ex)300 | Trade | | | | 55,766.15 |
| 17 Yiwu Paiqiang Jewelry Co., Ltd Economic Development Zone 3F, No. 30, Gaoxin East Road YIWU, ZHEJIANG 32200 | Michelle Kong michelle@paiqiangjewelry.com (212) 354-0434 | Trade | | | | 52341.44 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral | Unsecured claim |
| 18 CANA JEWELS LIMITED 8/F NO#27, HEHUA ROAD CHENGXI INDUSTRIAL AREA YIWU, ZHEJIANG CHINA 322000 | Catrina Huang catrina@canajewels.com 086-579-81570808 | Trade | | | | 49,933.87 |
| 19 KAHN LITWIN RENZA & CO., LTD. 951 NORTH MAIN STREET PROVIDENCE, RI 02904 | Keith Leduc (401) 274-2001 kleduc@kahnlitwin.com | Trade | | | | 47,931.05 |
| TUFTS HEALTH PLAN PO BOX 9224 CHELSEA, MA 02150-9224 | Courtney Victoria Courtney_Victoria @tufts-health.com 401-709-5326 (office) 401-340-6287 | | | | | 44,659.92 |

## **Schedule 3**

Holders of the Five (5) Largest Secured Claims Against the Debtors on a Consolidated Basis

Pursuant to Local Rule 1007-2(a)(5), to the best of the Debtors' knowledge and belief, the following table sets forth five (5) holders of the largest secured claims on a consolidated basis (excluding insiders) and information required by Local Rule 1007-2(a)(5).

Nothing herein shall constitute an admission of liability by the Debtors or a waiver of any claims or defenses the Debtors may have. The Debtors expressly reserve any and all rights to dispute the nature, amount, priority, or status of any claim or debt listed herein.

| No. | Holder | Mailing Address | Amount of Claim (Approximate) | Type of Collateral | Estimated Value of Collateral | Whether the Claim is Disputed |
|---|---|---|---|---|---|---|
| 1. | Webster Bank, N.A. | PO Box 191 Waterbury CT, 06720-0191 | $9,569,732.00[1] | Real estate, substantially all assets of PAW | Unknown | Undisputed |
| 2. | The Business Development Company | 40 Westminster Street; Suite 702; Providence, RI 02903 | $353,331.00 | Real estate, substantially all assets of Tanya Creations LLC | Unknown | Undisputed |

---

[1] Webster Bank asserts that, as of the Petition Date, the total amount outstanding is $9,222,453.33. The Debtors are continuing to review their books and records and will update such amount as appropriate.

**Schedule 4**

Summary of the Debtor's Assets and Liabilities

Pursuant to Local Rule 1007-2(a)(6), to the best of the Debtors' knowledge and belief, the below is a summary of assets and liabilities.

The following information does not constitute an admission of liability by the Debtors, and nothing herein shall constitute a waiver of any claims or defenses the Debtors may have. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt or challenge the priority, nature, amount or status of any clam or debt.

| | | | Tanya Creations and Affiliates | | | |
|---|---|---|---|---|---|---|
| | | | **Balance Sheet** | | | |
| | | | **For the Four Months Ending May 2, 2020** | | | |
| | | | | | | |
| SIX MONTH REVIEW | | | | | | |
| | | | | | | |
| | 11/30/19 | 12/31/19 | 02/01/20 | 02/29/20 | 03/28/20 | 05/02/20 |
| | | | | | | |
| ASSETS: | | | | | | |
| Current assets: | | | | | | |
| Cash and cash equivalents | 178,128.41 | 96,967.36 | 919,404.73 | (32,603.15) | (67,648.47) | 655,815.25 |
| Trade receivables | 9,061,486.76 | 5,969,908.68 | 3,955,155.68 | 4,108,349.01 | 2,954,275.68 | 2,863,218.17 |
| Reserves and Allowances | (146,119.74) | (1,500,624.46) | (1,229,102.90) | (1,319,407.89) | (673,241.31) | (686,253.57) |
| Deferred Expenses | 1,927,657.71 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Intercompany | 0.00 | (86,749.59) | (86,749.59) | (86,749.59) | (86,749.59) | (86,749.59) |
| Misc. Receivable | 1,530,590.38 | 1,444.31 | 1,133.61 | 984.29 | (337.94) | (213.62) |
| Loans & Exchanges | 1,953.98 | (1,480.20) | (2,025.25) | (1,885.25) | 30,096.11 | 98,647.42 |
| Inventories | 2,140,398.89 | 2,116,514.49 | 2,253,623.26 | 1,914,198.77 | 1,914,198.77 | 2,204,335.29 |
| Prepaid Expenses | 174,134.43 | 137,557.45 | 277,186.56 | 241,305.79 | 204,313.61 | 173,835.74 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Prepaid Insurance | 77,240.60 | 77,141.38 | 62,939.81 | 65,797.53 | 48,056.16 | 60,575.52 |
| Prepaid Consulting and Commission | 377,771.69 | 0.00 | 19.42 | 0.00 | 0.00 | 0.00 |
| Royalty and Related | 13,900.50 | 29,583.00 | 19,583.00 | 31,668.00 | 19,583.00 | 7,498.00 |
| Prepaid Taxes | 0.00 | 0.00 | 0.00 | 0.00 | 675.00 | 675.00 |
| | - | - | - | - | - | - |
| Total current assets | 15,337,143.61 | 6,840,262.42 | 6,171,168.33 | 4,921,657.51 | 4,343,221.02 | 5,291,383.61 |
| | | | | | | |
| Property and equipment, at cost | 7,020,207.02 | 7,019,786.13 | 7,024,286.13 | 7,028,029.56 | 7,036,280.43 | 7,047,052.94 |
| Less accumulated depreciation | (4,941,891.88) | (4,975,798.34) | (5,000,869.40) | (5,025,940.46) | (5,051,011.52) | (5,076,082.58) |
| | - | - | - | - | - | - |
| Net property and equipment | 2,078,315.14 | 2,043,987.79 | 2,023,416.73 | 2,002,089.10 | 1,985,268.91 | 1,970,970.36 |
| | | | | | | |
| Other assets: | | | | | | |
| Intangible IRC Section 197 | 113,750.00 | 112,500.00 | 111,250.00 | 110,000.00 | 108,750.00 | 107,500.00 |
| Goodwill and Going Concern Value | 439,285.00 | 434,457.00 | 429,629.00 | 424,801.00 | 419,973.00 | 415,145.00 |
| Investment in VIE | 2,264,693.00 | 2,264,693.00 | 2,264,693.00 | 2,264,693.00 | 2,264,693.00 | 2,264,693.00 |
| Investment in PJT | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 |
| CSV of life insurance | 539,931.58 | 586,363.64 | 586,363.64 | 586,363.64 | 586,363.64 | 586,363.64 |
| Deposits | 78,496.90 | 79,604.15 | 79,604.15 | 79,604.15 | 79,604.15 | 79,604.15 |
| Due from Shareholders | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | - | - | - | - | - | - |
| Total | 3,511,756.48 | 3,553,217.79 | 3,547,139.79 | 3,541,061.79 | 3,534,983.79 | 3,528,905.79 |
| | - | - | - | - | - | - |
| **TOTAL ASSETS** | 20,927,215.23 | 12,437,468.00 | 11,741,724.85 | 10,464,808.40 | 9,863,473.72 | 10,791,259.76 |
| | = | = | = | = | = | = |
| | | | | | | |
| LIABILITIES & STOCKHOLDERS' EQUITY | | | | | | |
| Current liabilities | | | | | | |
| Line of Credit - Wells Fargo | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,278,200.00 |
| Line of Credit - Webster | 8,612,551.79 | 7,927,962.19 | 7,929,359.28 | 7,549,634.25 | 7,926,074.92 | 8,008,273.99 |
| Current portion of L/T debt | 71,305.46 | 69,811.61 | 64,394.94 | 64,394.94 | 64,394.94 | 64,394.94 |
| Accounts Payable | 4,505,054.49 | 3,383,593.88 | 2,752,491.28 | 2,918,021.11 | 2,915,934.87 | 3,098,257.35 |
| Accrued Purchase Orders | 186,869.08 | 137,196.86 | 455,819.79 | 17,670.06 | 79,867.31 | 139,374.27 |
| Accrued Intransit Inventory | 0.00 | 297,511.00 | 151,521.56 | 151,521.56 | 151,521.56 | 151,521.56 |
| Accrued Misc. | 287,581.07 | 275,728.32 | 439,849.39 | 352,105.46 | 320,348.96 | 332,697.91 |
| Accrued Property Taxes | 8,203.89 | 14,440.19 | 5,349.09 | 10,367.09 | 15,385.09 | 4,716.10 |
| Accrued Interest | 12,609.78 | 19,368.81 | 19,368.81 | 19,368.81 | 19,368.81 | 19,368.81 |
| Accrued Payroll and Related | 120,113.18 | 109,828.80 | 129,118.42 | 131,196.20 | 103,434.87 | 100,595.00 |
| | - | - | - | - | - | - |
| Total Current Liabilities | 13,804,288.74 | 12,235,441.66 | 11,947,272.56 | 11,214,279.48 | 11,596,331.33 | 13,197,399.93 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Long-term debt, less current portion | | | | | | |
| Mortgage Payable - Webster Bank (ETYM) | 1,594,971.00 | 1,508,221.41 | 1,508,221.41 | 1,508,221.41 | 1,508,221.41 | 1,508,221.41 |
| Note Payable - RI-BDC | 377,583.71 | 370,916.71 | 364,249.71 | 357,582.71 | 350,915.71 | 350,915.71 |
| Loan payable - P Wallick | 710,000.44 | 710,000.44 | 710,000.44 | 710,000.44 | 710,000.44 | 710,000.44 |
| Note Payable - Webster Bank | 5,416.51 | 0.00 | 0.00 | (5,416.67) | (10,833.34) | (16,250.01) |
| Loan Payable - P. Wallick | 300,000.00 | 300,000.00 | 300,000.00 | 300,000.00 | 300,000.00 | 300,000.00 |
| Loan payable - Mercedes Van | (745.93) | 0.00 | 0.00 | (1,501.04) | (1,501.04) | (3,022.48) |
| | - | - | - | - | - | - |
| Total L-T Debt, less Current Portion | 2,987,225.73 | 2,889,138.56 | 2,882,471.56 | 2,868,886.85 | 2,856,803.18 | 2,849,865.07 |
| | | | | | | |
| Stockholders' equity | | | | | | |
| Common stock | 125,600.00 | 125,600.00 | 125,600.00 | 125,600.00 | 125,600.00 | 125,600.00 |
| Additional paid in capital | 2,530,553.93 | 2,530,553.93 | 2,530,553.93 | 2,530,553.93 | 2,530,553.93 | 2,530,553.93 |
| Retained earnings | 1,967,612.81 | (4,854,700.17) | (5,254,889.28) | (5,784,427.94) | (6,753,530.80) | (7,419,875.25) |
| Dividends - P Wallick | (496,577.88) | (497,077.88) | (497,795.82) | (498,595.82) | (500,795.82) | (500,795.82) |
| | - | - | - | - | - | - |
| Total Stockholders' Equity | 4,127,188.86 | (2,695,624.12) | (3,096,531.17) | (3,626,869.83) | (4,598,172.69) | (5,264,517.14) |
| | - | - | - | - | - | - |
| **TOTAL LIABILITIES & STKHLDRS EQUITY** | 20,918,703.33 | 12,428,956.10 | 11,733,212.95 | 10,456,296.50 | 9,854,961.82 | 10,782,747.86 |

## **Schedule 5**

The Debtors' Securities

Pursuant to Local Rule 1007-2(a)(7), to the best of the Debtors' knowledge and belief, the Debtors have no publicly traded stock, indentures, or securities.

As depicted on the corporate organization chart attached as Exhibit A, Peter Wallick is the sole shareholder of PAW Holdings, Inc. and Premiere Jewellery, Inc.

## **Schedule 6**

The Debtors' Property Not in the Debtors' Possession

Pursuant to Local Rule 1007-2(a)(8), to the best of the Debtors' knowledge and belief, the following is a list of property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any entity.

The following information does not constitute an admission of liability by the Debtors, and nothing herein shall constitute a waiver of any claims or defenses the Debtors may have. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt or challenge the priority, nature, amount or status of any clam or debt.

The Debtors submit that certain A/R is located in a lockbox in the control of Webster Bank. Moreover, the ordinary course of business, on any given day, property of the Debtors (including merchandise, inventory, security deposits or other collateral with counterparties to certain commercial relationships) is likely to be in the possession of various third parties, including, vendors, shippers, common carriers, distributors, warehousemen, service providers, custodians, public officers or agents, where the Debtors' ownership interest is not affected. Because of the constant movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting the property would be impractical.

## Schedule 7

### Premises

Pursuant to Local Rule 1007-2(a)(9), to the best of the Debtors' knowledge and belief, the following table includes a list of premises, leased or owned by the Debtors, from which the Debtors' operate their businesses:

| Address | Type of Interest |
|---|---|
| 360 Narragansett Park Drive<br>East Providence, RI 02916 | ETYM Properties, LLC (Owner/Lessor)<br>Tanya Creations, LLC (Lessee) |
| 389 Fifth Avenue<br>Suite 504<br>New York, NY 10016 (showroom) | Lease |
| Room 405, Bldg 32, #88 Chun Yang Road<br>Tianan Cyber Pk, Shandong, Chengyang<br>Qingdao 266109 CN | Lease |
| Room 516, Bonas Building<br>#505 Zongze North Road<br>Yiwu City, Zhejiang 322000 CN | Lease |

## Schedule 8

Location of the Debtors' Assets, Books, and Records

Pursuant to Local Rule 1007-2(a)(10), to the best of the Debtors' knowledge and belief, the following represents the locations of the Debtors' substantial assets and their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

**Location and Nature of the Debtors' Substantial Assets:**

As of May 2020, the Debtors have assets of more than $10.7 million as provided in Schedule 4, with substantial assets located in New York and Rhode Island. In addition, the Debtors operate offices located in China.

**Books and Records:**

The Debtors maintain their books and records on an information technology system. A majority of the Debtors' physical books and records are located in East Providence, Rhode Island.

## Schedule 9

Litigation

Pursuant to Local Rule 1007-2(a)(11), to the best of the Debtors' knowledge and belief, the following lists the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent as of the Petition Date.

- *Webster Bank, N.A. v. PAW Holdings, Inc., Tanya Creations, LLC, ETYM, Premiere, and PJT, LLC*, PC-2020-03151, filed April 10, 2020, in the Superior Court of the State of Rhode Island (Providence/Bristol County) for Appointment of Receiver, requesting that the Rhode Island Court appoint a receiver to take control of the assets, affairs, estate, effects, and property of the Debtors. On June 25, 2020, the Rhode Island Court appointed a receiver.

- *Webster Bank, N.A. v. Peter Wallick*, PC-2020-03659, filed May 5, 2020, in the Superior Court of the State of Rhode Island (Providence/Bristol County) for Breach of Guaranty: LOC Loan, seeking in excess of $8 million in damages and for Breach of Guaranty: Real Estate Loan, seeking in excess of $1.5 million in damages.

## Schedule 10

Senior Management

Pursuant to Local Rule 1007-2(a)(11), the following lists the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| Name | Title | Responsibility and Experience |
|------|-------|-------------------------------|
| Peter Wallick | Chief Executive Officer | Peter Wallick has been in the jewelry business for most of his life and founded Tanya Creations more than 40 years ago in 1978.  He learned the business from his father and was "in the business" as a college student and learned all aspects from the ground up.   Over the course of his career, he has led sales, manufacturing, design concepts and distribution and at his peak, annual sales reached nearly $50 million.  Mr. Wallick takes pride in knowing all of his customers on a personal basis and has been working with many of the same factories abroad for decades.  He is a native Rhode Islander and has been a proud, leading employer in the State who also enjoys family and having several of his children alongside him learning the business.  Mr. Wallick is widely respected as one of the most knowledgeable across the wholesale fashion jewelry and accessories business and has endured through many economic cycles along with a team of very loyal and committed employees, many also with Tanya for decades and since his start. |
| Andrew H. Moser | Chief Restructuring Officer | Andrew H. Moser has held numerous senior executive positions at leading financial institutions. He also served as Managing Director of SRA Consulting where he assisted financial institutions to safely navigate marketplace risks while still maintaining their focus on responsible growth and preservation of capital; while implementing best practices rooted in sound credit disciplines, safety and soundness. He was first hired by Tanya Creations and affiliates as a consultant and became Chief Operating and Financial Officer in January 2020. Due to the impending bankruptcy filing and to assist the Debtors in restructuring their debts, Mr. Moser was also recently appointed Chief Restructuring Officer. |
| Anna Farias | Global Sourcing and Supply Chain | Anna Farias has 33 years of experience in fashion jewelry.  She started her career developing jewelry in-house expanding the operations and sourcing to the |

| | | |
|---|---|---|
| | | Pacific Rim and has served as EVP Global Sourcing and has worked at Tanya Creations and affiliates for 12 years.    She builds long-term relationships with the vendor community to support company needs at all levels of product. |
| Evan Wallick | EVP Global Sales | Evan Wallick has long been involved in sales and marketing, starting as the Director of Marketing at James Gang Company in San Diego, then transitioning back to the jewelry industry in sales/account management for the past seven (7) years and now looking forward to take a more managerial and leadership role heading our sales team, strategic growth and new endeavors at Tanya Creations. |
| Norine Zwolenski | EVP, Design and Merchandising | Norine Zwolenski has been in the jewelry industry for 36 years. She started her career in sales and then moved to be a Partner later in her career.  For the past 25 years, she has served as EVP Design/ Merchandising and a contributing member of the C- Suite across the industry and was with Tanya 12 plus years before returning in February of 2020. |

## <u>Schedule 11</u>

**Payroll**

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), to the best of the Debtors' knowledge and belief, the following provides the estimated amount of weekly payroll of the Debtors' employees and estimated amount to be paid to officers, directors, and financial and business consultants retained by the Debtors for the 30-day period following the Petition Date.

| Payee | Amount |
|---|---|
| Employees | $14,032.00 |
| Officers, Directors, and Stockholders | $28,632.00 (EVP's only) |
| Financial and Business Consultants | $11,500.00 |

## __Schedule 12__

Cash Receipts and Disbursements, Net Cash Gain or Loss, Unpaid Obligations and Receivables

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue but remain unpaid, other than professional fees.

**Tanya Creations**
**Weekly Cash Flow Model**

**Tanya Creations** — Monthly Cash Flow

| | 1 | 2 | 3 | 4 | 5 weeks ending 5 | 6 | 7 | 8 | 4 weeks ending 9 | 10 | 11 | 12 | 13 | 5 weeks ending 14 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 6/28/2020 7/4/2020 | 7/5/2020 7/11/2020 | 7/12/2020 7/18/2020 | 7/19/2020 7/25/2020 | 7/26/2020 8/1/2020 | 8/2/2020 8/8/2020 | 8/9/2020 8/15/2020 | 8/16/2020 8/22/2020 | 8/23/2020 8/29/2020 | 8/30/2020 9/5/2020 | 9/6/2020 9/12/2020 | 9/13/2020 9/19/2020 | 9/20/2020 9/26/2020 | 9/27/2020 10/3/2020 | |
| **Weekly Forecasted P&L** | | | | | | | | | | | | | | | |
| Sales (Net of Discounts and Allowance) | 41,799 | 83,597 | 125,396 | 250,791 | 334,388 | 289,130 | 289,130 | 578,259 | 771,012 | 364,443 | 364,443 | 364,443 | 1,093,329 | 1,457,772 | Sales (Net of Discounts and Allowance) |
| Cost of Goods Sold | | | | | | | | | | | | | | | Cost of Goods Sold |
| Inventory Shipped | 19,412 | 38,823 | 58,235 | 116,469 | 155,292 | 134,274 | 134,274 | 268,547 | 358,063 | 162,661 | 162,661 | 162,661 | 487,983 | 650,644 | Inventory Shipped |
| Other COGS | 6,063 | 12,127 | 18,190 | 36,380 | 48,507 | 39,004 | 39,004 | 78,008 | 104,010 | 47,828 | 47,828 | 47,828 | 143,483 | 191,310 | Other COGS |
| **Cost of Goods Sold** | 25,475 | 50,950 | 76,425 | 152,849 | 203,799 | 173,277 | 173,277 | 346,555 | 462,073 | 210,489 | 210,489 | 210,489 | 631,466 | 841,954 | **Cost of Goods Sold** |
| Cost and Department Related Expenses | 14,434 | 14,434 | 14,434 | 14,434 | 14,434 | 27,656 | 27,656 | 27,656 | 27,656 | 37,559 | 37,559 | 37,559 | 37,559 | 37,559 | Cost and Department Related Expenses |
| Wages | 43,340 | 43,340 | 43,340 | 43,340 | 43,340 | 54,175 | 54,175 | 54,175 | 54,175 | 63,781 | 63,781 | 63,781 | 63,781 | 63,781 | Wages |
| Administrative Expenses | 42,000 | 42,000 | 42,000 | 42,000 | 42,000 | 37,500 | 37,500 | 37,500 | 37,500 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | Administrative Expenses |
| **Total Expenses** | 125,249 | 150,724 | 176,198 | 252,623 | 303,573 | 292,608 | 292,608 | 465,886 | 581,404 | 346,828 | 346,828 | 346,828 | 767,805 | 978,294 | **Total Expenses** |
| EBITDA | (83,450) | (67,126) | (50,803) | (1,832) | 30,815 | (3,479) | (3,479) | 112,373 | 189,608 | 17,615 | 17,615 | 17,615 | 325,524 | 479,478 | EBITDA |
| | | | | | | | | | | | | | | | Working Capital Facility Fees |
| | | | | | | | | | | | | | | | Interest on WCF |
| | | | | | | | | | | | | | | | Interest and Fees on PO Funding |
| | | | | | | | | | | | | | | | Interest Expense and Fees |
| | | | | | | | | | | | | | | | Depreciation |
| | | | | | | | | | | | | | | | Net Income before Taxes |
| | | | | | | | | | | | | | | | Year To Date |
| **Weekly Cash Flow** | | | | | | | | | | | | | | | **Weekly Cash Flow** |
| Beginning Cash Balance: | 170,280 | 120,255 | 54,585 | 20,831 | 49,016 | 121,583 | 166,473 | 177,403 | 393,138 | 816,020 | 863,690 | 928,799 | 896,753 | 1,397,409 | Beginning Cash Balance: |
| **Cash Inflows** | | | | | | | | | | | | | | | **Cash Inflows** |
| Sales (Net of Discounts and Allowance) | 41,799 | 83,597 | 125,396 | 250,791 | 334,388 | 289,130 | 289,130 | 578,259 | 771,012 | 364,443 | 364,443 | 364,443 | 1,093,329 | 1,457,772 | Sales (Net of Discounts and Allowance) |
| Advance from Working Capital Facility (WCF) | 33,439 | 66,878 | 100,317 | 200,633 | 267,511 | 231,304 | 231,304 | 462,607 | 616,810 | 291,554 | 291,554 | 291,554 | 874,663 | 1,166,218 | Advance from Working Capital Facility (WCF) |
| Collection on Account (Remitted to WCF) | | | | | | | | | - | | 125,396 | 125,396 | 250,791 | 334,388 | Collection on Account (Remitted to WCF) |
| Retained by WCF | | | | | | | | | - | | 100,317 | 100,317 | 200,633 | 267,511 | Retained by WCF |
| Net to Company | | | | | | | | - | - | | 25,079 | 25,079 | 50,158 | 66,878 | Net to Company |
| **Total Cash Inflows from Operations:** | 33,439 | 66,878 | 100,317 | 200,633 | 267,511 | 231,304 | 231,304 | 462,607 | 616,810 | 291,554 | 316,634 | 316,634 | 924,821 | 1,233,095 | **Total Cash Inflows from Operations:** |
| **Cash Outflows** | | | | | | | | | | | | | | | **Cash Outflows** |
| Inventory Required | 58,235 | 58,235 | 116,469 | 155,292 | 134,274 | 134,274 | 268,547 | 358,063 | 162,661 | 162,661 | 162,661 | 487,983 | 650,644 | 107,835 | Inventory Required |
| Old Inventory to be Released | 5,823 | 5,823 | 11,647 | 15,529 | 13,427 | 13,427 | 26,855 | 35,806 | 16,266 | 16,266 | 16,266 | 48,798 | 65,064 | 10,784 | Old Inventory to be Released |
| Purchases (goods received) | 52,411 | 52,411 | 104,822 | 139,763 | 120,846 | 120,846 | 241,693 | 322,257 | 146,395 | 146,395 | 146,395 | 439,185 | 585,580 | 97,052 | Purchases (goods received) |
| PO Funding | | | | | | 104,822 | 104,822 | 139,763 | 120,846 | 120,846 | 241,693 | 322,257 | 146,395 | 146,395 | PO Funding |
| Vendor Payment from PO Funding | | | | | | (104,822) | (104,822) | (139,763) | (120,846) | (120,846) | (241,693) | (322,257) | (146,395) | (146,395) | Vendor Payment from PO Funding |
| Vendor Payment from Company | | | | | | | | | - | | (25,079) | (25,079) | (50,158) | (66,878) | Vendor Payment from Company |
| Re-Payment of PO Funding | | | | | | | | | | (25,079) | (25,079) | (50,158) | | | Re-Payment of PO Funding |
| Net Cash Used to Fund Purchases | - | - | - | - | - | - | - | - | - | (25,079) | (25,079) | (50,158) | | (66,878) | Net Cash Used to Fund Purchases |
| Other Cost of Goods Sold (Freight ) | 18,190 | 18,190 | 26,380 | 38,507 | 39,004 | 39,004 | 78,008 | 104,010 | 47,828 | 47,828 | 143,483 | 191,310 | 32,963 | | Other Cost of Goods Sold (Freight ) |
| Payroll | 43,340 | 43,340 | 43,340 | 43,340 | 43,340 | 54,175 | 54,175 | 54,175 | 54,175 | 63,781 | 63,781 | 63,781 | 63,781 | 63,781 | Payroll |
| Cash Used for Direct Costs | (61,530) | (61,530) | (69,720) | (103,847) | (82,344) | (93,179) | (132,183) | (158,185) | (102,003) | (111,609) | (136,688) | (232,343) | (305,249) | (163,621) | Cash Used for Direct Costs |
| **Selling, general and Administrative** | | | | | | | | | | | | | | | **Selling, general and Administrative** |
| **Cost and Department Expenses** | 14,434 | 14,434 | 14,434 | 14,434 | 14,434 | 27,656 | 27,656 | 27,656 | 27,656 | 37,559 | 37,559 | 37,559 | 37,559 | | **Cost and Department Expenses** |
| **Administrative Expenses** | 42,000 | 42,000 | 42,000 | 42,000 | 42,000 | 37,500 | 37,500 | 37,500 | 37,500 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | **Administrative Expenses** |
| **Total Cash Outflows** | (75,964) | (117,964) | (126,154) | (138,281) | (180,778) | (158,334) | (197,338) | (223,341) | (167,158) | (184,167) | (209,247) | (304,902) | (377,808) | (236,180) | **Total Cash Outflows** |
| **Net Cash Flow From Operations** | (42,525) | (51,086) | (25,838) | 42,352 | 86,733 | 72,969 | 33,965 | 239,267 | 449,651 | 107,387 | 107,387 | 11,732 | 547,013 | 996,915 | **Net Cash Flow From Operations** |
| Adequate Protection- Webster Inventory | | | | | | | (3,250) | | | | (6,465) | | | | Adequate Protection- Webster Inventory |
| Adequate Protection - BDC Loan | | (6,667) | | | | (6,667) | | | | (6,667) | | | | | Adequate Protection - BDC Loan |
| Interest and Fees on WCF | (7,500) | (7,917) | (7,917) | (7,917) | (7,917) | (7,917) | (7,917) | (7,917) | (7,917) | (30,958) | (7,917) | (7,917) | (7,917) | (40,571) | Interest and Fees on WCF |
| Finance Fees and Interest on Purchase Order Funding Paid | - | - | - | (6,250) | (6,250) | (9,059) | (11,868) | (15,614) | (18,853) | (22,091) | (27,897) | (35,861) | (38,440) | | Finance Fees and Interest on Purchase Order Funding Paid |
| Capital Expenditures | | | | | | | | | | | | | | | Capital Expenditures |
| **Net Change in Cash** | (50,025) | (65,670) | (33,754) | 28,186 | 72,567 | 44,890 | 10,930 | 215,735 | 422,882 | 47,670 | 65,108 | (32,046) | 500,656 | 898,837 | **Net Change in Cash** |
| **Ending Cash** | 120,255 | 54,585 | 20,831 | 49,016 | 121,583 | 166,473 | 177,403 | 393,138 | 816,020 | 863,690 | 928,799 | 896,753 | 1,397,409 | 2,296,245 | **Ending Cash** |
| Balance Outstanding on WCF | 33,439 | 100,317 | 200,633 | 401,266 | 668,777 | 900,080 | 1,131,384 | 1,593,991 | 2,210,801 | 2,502,355 | 2,693,593 | 2,884,831 | 3,558,861 | 4,457,568 | Balance Outstanding on WCF |
| Balance Outstanding on PO Funding | | | | | | 104,822 | 209,645 | 349,408 | 470,254 | 591,100 | 807,714 | 1,104,891 | 1,201,128 | 1,280,645 | Balance Outstanding on PO Funding |
| Accounts Receivable | 41,799 | 125,396 | 250,791 | 501,583 | 835,971 | 1,125,101 | 1,414,230 | 1,992,489 | 2,763,501 | 3,127,944 | 3,366,991 | 3,606,039 | 4,448,576 | 5,571,960 | Accounts Receivable |
| | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | |
| Interest on Working Capital Facility Fee | | | | | 1,346 | | | | 6,991 | | | | 15,426 | | |
| Collateral Management Fee on WCF | | | | | 3,090 | | | | 16,050 | | | | 35,414 | | |
| Total | | | | | 4,436 | | | | 23,041 | | | | 50,840 | | |