MORGAN, LEWIS & BOCKIUS LLP
Jonathan K. Bernstein
Craig A. Wolfe
Jason R. Alderson
101 Park Avenue
New York, NY 10178
Telephone:  (212) 309-6000
jonathan.bernstein@morganlewis.com
craig.wolfe@morganlewis.com
jason.alderson@morganlewis.com

*Counsel for Webster Bank, N.A.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| PREMIERE JEWELLERY, *et al.*,[1] | Case No. 20-11484 (JLG) |
| Debtors. | (Joint Administration Requested) |

**PRELIMINARY OBJECTION OF WEBSTER BANK, N.A. TO
DEBTORS' MOTION FOR AUTHORITY TO (A) OBTAIN
POSTPETITION FINANCING; (B) USE CASH COLLATERAL;
(C) GRANT ADEQUATE PROTECTION TO PREPETITION SECURED
PARTIES; (D) SCHEDULE FINAL HEARING; AND (E) GRANT RELATED RELIEF**

Webster Bank, N.A. ("Webster") submits this objection (the "Preliminary Objection") to the *Debtors' Motion for Authority to (A) Obtain Postpetition Financing; (B) Use Cash Collateral; (C) Grant Adequate Protection to Prepetition Secured Parties; (D) Schedule Final Hearing; and (E) Grant Related Relief* [Dkt. No. 9] (the "DIP Motion").  In further support of this Motion, Webster respectfully states as follows:[2]

---

[1] The Debtors in these cases are each alleged to be incorporated or organized in the state of Rhode Island, and along with the last four digits of each Debtor's federal tax identification number are represented as follows: Premiere Jewellery, Inc. [0250]; Tanya Creations, LLC [1867]; PAW Holdings, Inc. [9043]; ETYM Properties, LLC [4377]; and PJT, LLC [3105].

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Motion.

**VENUE; RESERVATION OF RIGHTS**

1.  The Debtors contend that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Webster is investigating whether this Court represents proper venue given that the Debtors are all incorporated or organized in Rhode Island, their principal places of business are in Rhode Island, Peter Wallick (owner/president/sole manager) resides and works on Rhode Island and, with conspicuous exception of Mr. Wurst, counsel appearing on behalf of the parties in the Receivership Action are barred and practice in Rhode Island.  Webster would submit that the sole basis on which these cases were filed in the present venue is the convenience of Mr. Wurst and not based on the appropriateness of the present venue.  Webster reserves all rights to contest venue if necessary and the filing of this Preliminary Objection in response to the DIP Motion shall not be deemed to constitute a waiver of any of Webster's rights to do so.

**BACKGROUND**

**A.    Chapter 11 Cases**

2.  On June 25, 2020 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  No trustee or examiner has been appointed in these cases.

3.  The Chapter 11 Cases were filed the same day the Providence/Bristol County (Rhode Island) Superior Court ("State Court") [Case No. 2020-03151 before the Honorable Associate Justice Brian P. Stern (the "Receivership Action")], appointed a temporary receiver to take possession and charge of the Debtors' property and business pending further order of the State Court.

4.  On Jun 30, 2020, Webster filed that certain *Emergency Motion of Webster Bank, N.A. for an Order Dismissing the Debtors Chapter 11 Cases With Prejudice or, in the Alternative, Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104*

[Dkt. No. 13] (the "Dismissal/Trustee Motion").  As set forth therein, Webster seeks the prompt dismissal of the Chapter 11 Cases as bad faith filings in light of the Receivership Action or, in the alternative, the replacement of Debtors' management with a Chapter 11 trustee in connection with the submission of at least two fraudulent borrowing base certificates to Webster under the Revolving Loan Agreement (defined below) in January and February 2020.

      **B.**      **The Debtors' Prepetition Capital Structure**

5.      Peter A. Wallick directly owns 100% of the equity of Debtor Premiere Jewellery, Inc. ("Premiere") and Debtor PAW Holdings, Inc. ("PAW").  PAW directly or indirectly holds 100% of the respective membership interests of Debtor Tanya Creations, LLC ("Tanya") and Debtor PJT, LLC ("PJT").  Mr. Wallick holds 70% of the membership interests of Debtor ETYM Properties, LLC ("ETYM"), with the balance held by various family members.  Mr. Wallick is the president or sole-manager (as applicable) for each of the Debtors.

6.      As of the Petition Date, the aggregate outstanding balance due and owing by the Debtors under the Secured Credit Agreements (defined below) is $9,221,453.33, as follows:

1. Revolving Loan Agreement.  Originally dated April 19, 2007, the revolving loan facility provided by Webster has undergone numerous amendments (the "Revolving Loan Agreement").  At present, the borrowers under the Revolving Loan Agreement are PAW and Tanya, the guarantors are Premiere, PJT, ETYM and Mr. Wallick, and the amount of the line of credit made available under the agreement is an aggregate maximum amount of $11 million.  The Revolving Loan Agreement is secured by (i) valid, perfected and enforceable security interests and all-asset liens in and on all personal property of the Debtors primarily consisting of account receivables, inventory, equipment, and certain life insurance policies held by Mr. Wallick; and (ii) a second mortgage on the ETYM Real Estate (defined below).  The Revolving Loan Agreement matured on March 31, 2020 and is currently in default.  As of the Petition Date, the aggregate outstanding balance due and owing under Revolving Loan Agreement is $7,672,641.11.

3

Webster's liens on all or substantially all assets of the Debtors is evidenced by, among other things, security agreements dated as of April 17, 2007, March 4, 2016 and September 26, 2017 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreements"). The Security Agreements were executed by each of the Debtors, with the exception of ETYM, which owns the real estate.

2. Real Estate Loan. On September 26, 2017, ETYM, as borrower, the remaining Debtors and Mr. Wallick, as guarantors, and Webster, as lender, entered into a real estate loan (the "Real Estate Loan") pursuant to which ETYM borrowed $1.735 million against real property it owns in Rhode Island (the "ETYM Real Estate"). The Real Estate Loan is secured by a first mortgage on the ETYM Real Estate, and is currently in default as a result of the defaulted Revolving Loan Agreement. As of the Petition Date, the aggregate outstanding balance due and owing under the Real Estate Loan is $1,510,895.73.

3. Term Loan. On December 11, 2015, PAW, as borrower, the remaining Debtors and Mr. Wallick, as guarantors, and Webster, as lender, entered into a loan agreement (as amended and in effect from time to time, the "Term Loan," and together with the Revolving Loan Agreement and the Real Estate Loan, and the "Secured Credit Agreements"), pursuant to which PAW borrowed $325,000. The Term Loan is currently in default as a result of the defaulted Revolving Loan Agreement. As of the Petition Date, the aggregate outstanding balance due and owing under the Term Loan is $37,916.49.

C. **The DIP Motion**

7. By the DIP Motion, the Debtors request postpetition financing consisting of up to (i) $9.5 million under a postpetition accounts receivable factoring facility (the "Factoring Facility") to be provided by Factors Southwest L.L.C. ("FSW"), with the full amount available upon entry of the Interim Order; and (ii) $2.5 million for purchase order financing under a facility (the "Purchase Order Facility") provided by King Trade Capital ("KTC"), again with the full amount available upon entry of an Interim Order.

8. The Factoring Sellers under the Factoring Facility are defined in the DIP Motion and/or the Interim Order as Debtors Premiere, Tanya and PAW, and the facility is secured by a

4

first priority security interest in and lien upon all postpetition property of the Debtors that is not otherwise subject to valid and perfected liens as of the Petition Date pursuant to Section 364(c)(2) of the Bankruptcy Code (the "DIP Collateral").[3]

9. The PO Sellers under the Purchase Order Facility are defined in the DIP Motion and/or the Interim Order as Debtor Tanya, and the facility is secured by the DIP Collateral, subject to an intercreditor agreement with FSW.

10. In addition, the Debtors intend to sell off prepetition inventory, all of which constitutes Webster's collateral, in conjunction with fulfilling postpetition sales to the Debtors' customers.[4] The Debtors characterize the sale of the inventory collateral as entitling Webster to adequate protection under section 361 of the Bankruptcy Code equal to the "net forced liquidation value" of the inventory at "7% of cost."[5] Reports on the sale of Webster's inventory collateral will be provided by the Debtors each month along with the proposed adequate protection payments.

11. Although Webster's liens under the Secured Creditor Agreements go beyond accounts receivable and inventory to cover all or substantially all of the Debtors' assets, the DIP Motion is silent as to their continued use and the provision of adequate protection.

**ARGUMENT**

12. Before turning to the substance of this Preliminary Objection, Webster respectfully requests that the DIP Motion is heard after the Court has considered the Dismissal/Trustee Motion. The Court's determination of the Dismissal/Trustee Motion could render the DIP Motion moot, or at the very least premature. For instance, a Chapter 11 trustee, if

---

[3] *See* Interim Order, at ¶ 9.
[4] DIP Motion, at ¶ 25.
[5] DIP Motion, at ¶ 25.

5

appointed, should be provided time to independently assess whether the relief requested in the DIP Motion would be in the best interests of the Debtors' estates.

13. As to the DIP Motion, the adequate protection package proposed by the Debtors is woefully inadequate and unsupportable as a matter of law. The Bankruptcy Code requires that courts adequately protect secured creditors' interests in their collateral. *See* 11 U.S.C. §§ 361, 362, 363 and 364; *see also United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203-04 (1983) ("At the secured creditor's insistence, the bankruptcy court must place such limits or conditions on the trustee's power to sell, use, or lease property as are necessary to protect the creditor."). This entitlement "is derived from the Fifth Amendment protection of property interests" and "is based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain." H.R. Rep. No. 95-595, at 339 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963, 6295 (*citing Wright v. Union Central Life Ins. Co.*, 311 U.S. 273 (1940), and *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555 (1935)). Apart from being constitutionally mandated, protection of the secured creditors' bargain is dictated by sound policy considerations: no reorganization where the debtor needed to be able to consensually use a secured creditor's cash collateral would ever be possible unless the secured creditor was confident that the protection it receives on the downside is real and will not be taken away.

14. To the extent the liens granted to an undersecured creditor under section 361 of the Bankruptcy Code prove to be insufficient in providing adequate protection to such creditor's interest in its collateral, the secured creditor is entitled to a superpriority claim under section 507(b) of the Bankruptcy Code, which entitles such creditor to recovery ahead of every unsecured and regular administrative creditor. *See, e.g.*, *LNC Investments, Inc. v. First Fidelity*

6

*Bank*, 247 B.R. 38, 41 (S.D.N.Y. 2000) (stating that "in the privileged world of administrative claims, the § 507(b)-anointed claim is *primus inter pares*.").

15. Section 361 of the Bankruptcy Code, which generally provides for the secured creditors' entitlement to adequate protection, provides no guidance to determining the amount of the adequate protection to which such creditors may be entitled (whether on a secured or superpriority basis). Generally, however, the <u>starting point</u> to measure adequate protection is the bankruptcy petition date. *See, e.g., In re Residential Capital, LLC*, 501 B.R. 549, 592 (Bankr. S.D.N.Y. 2013) (stating that, to establish their entitlement to an adequate protection claim, creditors were required to show that the aggregate value of their prepetition in collateral diminished from the petition date to the effective date of the debtors' reorganization plan). The Supreme Court provides guidance on how to measure or calculate the starting point valuation. In *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953 (1997), the Supreme Court explained that there are three potential methodologies for determining the value of a secured creditor's collateral: (i) the foreclosure value (i.e., what the secured creditor could obtain through a foreclosure sale), (ii) the replacement value (i.e., what the debtor would have to pay for comparable property), and (iii) the midpoint between the two. *Id*. at 955-56. The Supreme Court held that the choice between these three methodologies must be determined <u>in light of the "proposed use" of the collateral at issue</u>. *Id*. at 962 (stating that the "proposed disposition or use" of the collateral is of "paramount importance to the valuation question.").

16. The Supreme Court went on to explain that where the debtor intends to "retain" and "use the collateral to generate an income stream" (as opposed to surrendering the collateral to the secured creditor either voluntarily or through foreclosure), the appropriate valuation of the collateral should be its "replacement value." *Id*. at 963; *e.g., In re Sabine Oil & Gas Corp.*, 547

7

B.R. 503, 576 (Bankr. S.D.N.Y. 2016) (finding that "going concern or fair market valuation is the appropriate methodology" where the intended disposition for the collateral is to preserve going concern value).

17.  The valuation <u>endpoint</u> is much simpler.  Courts have overwhelmingly held that the best evidence of collateral value is its <u>actual sale price</u>.  *See, e.g., In re SW Boston Hotel Venture, LLC*, 748 F.3d 393, 411 (1st Cir. 2014) (stating that courts routinely use the sale price as the best evidence of valuation of collateral); *In re Motors Liquidation Co.*, 482 B.R. 485, 493 (Bankr. S.D.N.Y. 2012) (same); *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 870 (4th Cir. 1994) (same).

18.  Here, the Debtors' proposed use of Webster's inventory and/or cash collateral should be denied unless the proposed adequate protection is modified in at least several material respects.  The starting valuation of the Webster inventory based on liquidation value is entirely improper as the proposed sales are to customers in the ordinary course of business.  The correct valuation methodology is replacement.  But regardless of the methodology, it is unclear why Webster is not entitled to the value of the collateral as determined by the *actual* sale price.  This is the best evidence of collateral value.  The Debtors claim their proposal provides the "indubitable equivalent" of Webster's interests in the prepetition inventory collateral.  This fails to appreciate the Revolving Loan Agreement is in default, has been for months (and has, in fact, matured by its terms), and Webster is entitled to 100% of collateral proceeds.  The indubitable equivalent under these circumstances would the sale price obtained from the Debtors upon sale.  Accordingly, the proposed sale of the Webster collateral must be denied until, at a minimum, adequate protection is reconciled as noted above.  Failing that, all proceeds from the sale of the Webster collateral must be segregated and/or escrowed pending further order of the Court after

notice and hearing. Finally, if the sale of Webster's inventory is permitted, Webster must be protected in the form of accurate, real time reporting and oversight of the Debtors in a form and manner to be agreed on.

19. The DIP Motion is infirm in other key aspects as well. Webster's collateral under the Secured Credit Agreements includes molds for the production of jewelry, machinery and equipment, office furniture and equipment, and other items. All of that is ignored in the DIP Motion and in the Interim Order,[6] yet the Debtors intend to use such collateral to run their business in the ordinary course and the collateral will diminish in value as a result. The same holds true for the ETYM Real Estate encumbered by first and second mortgages in favor of Webster under the Real Estate Loan and the Revolving Loan Agreement. The Debtors are in payment default under the accelerated Real Estate Loan and have not been making payments. The Debtors sidestep this reality and claim Webster is not entitled adequate protection in respect of the ETYM Real Estate based on an October 2019 appraisal, which in the current environment is aged to the point of being meaningless, and also fails to appreciate Webster's first <u>and</u> second liens on the property. The Debtors' proposed use of Webster collateral that is either ignored by the DIP Motion or dismissed as with the case with the ETYM Real Estate should be denied pending payment of adequate protection as mutually agreed by the parties. In addition, the Debtors' stipulations found in paragraph 4 of the Interim Order as to the scope of Webster's collateral must be amended to include *all* of Webster's collateral as noted herein.

20. Even if adequate protection is provided, if later deemed inadequate the Debtors' offer of superiority 507(b) administrative claims as adequate protection is illusory.[7] The rationale as to why is simple—such claims are unlikely to prove collectable. Neither the DIP

---

[6] Paragraph 4 of the Interim Order is conspicuously silent as to the scope of Webster's collateral through the omission of items that include the jewelry molds.

[7] Interim Order, at ¶ 16.

9

Superpriority Claims and/or DIP Collateral contain a carve out for 507(b) claims that may be asserted by Webster. As subordinated 507(b) claims, Webster carries all of the risk in these cases in the event of administrative insolvency. Webster's 507(b) claims should at least be *pari passu* with the DIP Superpriority Claims.

21. Webster objects to paragraphs 17 and 18 of the Interim Order with respect to the treatment of postpetition accounts receivable. In each paragraph, Webster and/or an account debtor is required to collect in the lockbox and forward all postpetition accounts receivable to the Debtors or to the proposed DIP lenders. While this unreasonably shifts to Webster the real life burden of determining the timing of the sale generating the payment, it also ignores the fact that Webster is entitled to 100% of the proceeds from the sale of its collateral. Accordingly, to the extent the motion is granted in any form, this aspect of the relief should be modified to require 100% of the accounts receivable will be collected in the Webster lockbox. Only after a proper reconciliation of whether the receipts constitute the proceeds of Webster's collateral or that of the proposed DIP lenders, should Webster be required to transfer any funds to the Debtors or the DIP lenders. Otherwise, even assuming the Debtors can theoretically demonstrate adequate protection for the use of Webster's collateral (which the current proposal fails to do), the Debtors' troubling banking history with Webster (including the fraudulent borrowing base certificates described in the Dismissal/Trustee Motion) suggests such adequate protection would ultimately fail unless the above changes are implemented.

**WHEREFORE**, for the foregoing reasons, Webster requests that the DIP Motion be denied, and that the Court granted such other relief as may be deemed necessary or just.

## RESERVATION OF RIGHTS

Webster reserves its rights to further amend, modify, or supplement this Preliminary Objection prior to or at the hearing conducted on the DIP Motion to consider interim approval. Webster also reserves all rights to object to the approval of the DIP Motion on a final basis on any grounds, including any and all argument or issues not previously raised in this Preliminary Objection. Webster further reserves the right to conduct discovery of the Debtors in connection with the DIP Motion to the extent it deems necessary in its sole and absolute discretion.

Dated: July 1, 2020

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

By: */s/ Craig A. Wolfe*
Jonathan K. Bernstein
Craig A. Wolfe
Jason R. Alderson
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000
jonathan.bernstein@morganlewis.com
craig.wolfe@morganlewis.com
jason.alderson@morganlewis.com

*Counsel to Webster Bank, N.A.*